ROBERT R. BOWEN AND ELIZABETH S. BOWEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12745–79.     Filed January 20, 1982.

*James H. Sheehan* and *John S. Ball*, for the petitioners.
*Ben G. Reeves*, for the respondent.

STERRETT, *Judge*: By statutory notice dated June 8, 1979, respondent determined deficiencies in petitioners' Federal

income taxes of $158.20 and $10,724.42 for the taxable years 1973 and 1975, respectively, and an addition to tax for negligence or intentional disregard of rules or regulations in the amount of $536.22 for the 1975 taxable year. The issues presented for decision are: (1) Whether a sale of stock between petitioner-husband and petitioner-wife was a bona fide transaction entitled to recognition for Federal income tax purposes; (2) if not, whether the basis of a portion of such stock subsequently resold by husband was correctly computed by respondent; and (3) whether petitioners are liable for the addition to tax under section 6653(a), I.R.C. 1954, for the taxable year 1975.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Robert R. Bowen and his wife Elizabeth S. Bowen resided in Ponte Vedra Beach, Fla., at the time of filing the petition herein. They filed joint Federal income tax returns for the taxable years 1973 and 1975 with the Internal Revenue Service Center at Chamblee, Ga. The returns were prepared in accordance with the cash receipts and disbursements method of accounting.

In June of 1964, Telfair Corp. (hereinafter Telfair) was incorporated by James R. Stockton, Sr., father of petitioner Elizabeth S. Bowen, and by two family-related trusts. The corporation was formed for the principal purpose of acquiring the stock of Moore Dry Kiln Co. of Oregon (hereinafter Moore-Oregon), which manufactures and installs dry kilns and custom design systems for the treating and handling of forest products. In order to purchase the Moore-Oregon stock, it was necessary for Telfair to borrow approximately $2,200,000 from the Morgan Guaranty Trust Co. of New York on a demand note. The note was later refinanced on a long-term basis with the Gulf Life Insurance Co. and with other financial institutions located in Jacksonville, Fla.

In 1968, 3,000 shares of Telfair stock were issued and outstanding. One thousand shares were owned by James R. Stockton, Sr., 1,000 shares were held in a revocable trust for the benefit of James Stockton, Jr., Mr. Stockton's son, and

1,000 shares were held in a revocable trust for the benefit of Elizabeth S. Bowen, Mr. Stockton's daughter.

On or about June 25, 1968, James R. Stockton, Sr., sold his 1,000 shares to his son and to his daughter's husband, petitioner Robert R. Bowen, with each acquiring 500 shares. The sale was structured as a private annuity transaction with Mr. Stockton receiving in consideration for his shares the right to receive annual annuity payments for the remainder of his lifetime. However, James R. Stockton, Sr., died on February 11, 1969, before any payments had been made on the annuity. Consequently, because they were not required to surrender any value in exchange for the stock they received from Mr. Stockton, Sr., James Stockton, Jr., and Robert R. Bowen each had a zero basis in their respective 500 shares.

After the sale by James Stockton, Sr., of his stock, James Stockton, Jr., owned one-half (or 1,500 shares), Elizabeth S. Bowen owned one-third (or 1,000 shares), and Robert R. Bowen owned one-sixth (or 500 shares) of the total 3,000 shares of Telfair that were then issued and outstanding.[1] James Stockton, Jr., held the office of president of the corporation, and, being the largest shareholder, he had the ability to form Telfair's policies and control its direction at that time. Mr. Bowen was secretary-treasurer of the company, while Mrs. Bowen took no part in the affairs of Telfair.

In the late 1960's, Telfair's forest products business experienced a period of growth, thereby creating a need for additional working capital. Such capital was not readily available to Telfair since it was a privately held company owned exclusively by related shareholders. Therefore, the shareholders began to consider the prospect of merging with a publicly held company for purposes of raising the additional capital through public stock sales.

A natural candidate for the contemplated merger was Industrial-America Corp. (hereinafter sometimes referred to as Industrial-America), a corporation for which Mr. Bowen had worked in an executive capacity since the 1950's. Industrial-America, a Florida corporation, was essentially a holding

---

[1]The record does not indicate when the revocable trusts for the two Stockton children distributed the Telfair stock to the trust beneficiaries, but we assume that it was sometime in 1968.

company consisting of a conglomeration of some 8 to 10 corporations. It was engaged directly and through its subsidiaries in a variety of business ventures, including renting, insurance, sewer and water utility service, and the sale of shell homes. Its controlling shareholder was Mr. R. Eugene Orr, who had supported and had been somewhat responsible for Mr. Bowen's swift rise in the organization. Industrial-America's stock was, and, with the exception of certain "lettered stock" discussed below, continues to be, traded in the over-the-counter market.

After negotiations, an agreement of merger was executed between Telfair and Industrial-America on October 23, 1968, with Industrial-America designated as the continuing entity. In order to obtain a private letter ruling from the Internal Revenue Service that the merger would qualify as a nontaxable reorganization, the parties were obligated to fulfill certain requirements. First, Industrial-America was required to assume Telfair's total outstanding indebtedness. Second, James Stockton, Jr., and Mr. and Mrs. Bowen were required to purchase additional but previously unissued shares of Industrial-America common stock, and Industrial-America was required to apply the resultant sales proceeds to the payment of liabilities assumed from Telfair. These requirements were fulfilled in the subsequent nontaxable reorganization.

In early 1969, Industrial-America acquired substantially all of Telfair's assets and assumed Telfair's liabilities pursuant to the plan of reorganization. On or about March 25, 1969, Telfair was liquidated.

In the reorganization, the three shareholders of Telfair collectively received 856,662 shares of Industrial-America stock in exchange for their conveyance to Industrial-America of the assets of Telfair. They also purchased an additional 254,564 shares of Industrial-America stock at a price of $10 per share. In both transactions, the Industrial-America stock was received by each of the shareholders in proportion to their former stock holdings in Telfair Corp. Accordingly, of the total 1,111,226 shares of Industrial-America stock acquired by the three shareholders, James Stockton, Jr., acquired one-half, or 555,613, Mrs. Bowen acquired one-third, or 370,409 shares, and Mr. Bowen acquired one-sixth, or 185,204 shares. The stock acquired had a par value of $1.25 per share. The combined holdings of James Stockton and the Bowens only constituted approximately 70 percent of Industrial-America's issued and

outstanding stock, however, due to the fact that there were continuing shareholders from the premerger ownership of Industrial-America. One of the continuing shareholders was Mr. Orr, the former controlling shareholder of Industrial-America, whose stock ownership in the corporation slipped from 50 percent to 12½ percent as a result of the merger. Mr. Orr remained on the board of directors after the merger.

The following chart reflects the number of Industrial-America shares held by James Stockton, Jr., and Mr. and Mrs. Bowen immediately after the reorganization, the basis per share, the total basis, and the manner in which the shares were acquired:

### Mrs. Bowen

| Acquired | Number of shares | Basis per share | Total basis |
|---|---|---|---|
| 1. Purchase— (one-third of 254,564) | 84,855 | $10.00 | $848,550 |
| 2. Received in exchange for Telfair stock— (one-third of 856,662) | 285,554 | 0.3501 | 100,000 |
| | 370,409 | | 948,550 |

### James Stockton, Jr.

| Acquired | Number of shares | Basis per share | Total basis |
|---|---|---|---|
| 1. Purchase— (one-half of 254,564) | 127,282 | $10.00 | $1,272,820 |
| 2. Received in exchange for Telfair stock— (one-half of 856,662): | | | |
| a. Original one-third ownership of Telfair stock | 285,554 | 0.3501 | 100,000 |
| b. One-sixth ownership of Telfair stock— purchased from James R. Stockton, Sr. (6/25/68) | 142,777 | 0 | --- |
| | 555,613 | | 1,372,820 |

### Mr. Bowen

| Acquired | Number of shares | Basis per share | Total basis |
|---|---|---|---|
| 1. Purchase— (one-sixth of 254,564) | 42,427 | $10.00 | $424,270 |
| 2. Received in exchange for Telfair stock— (one sixth of 856,662) (one-sixth ownership of Telfair stock— purchased from James R. Stockton, Sr. (6/25/68)) | 142,777 | 0 | --- |
| | 185,204 | | 424,270 |

Both James Stockton, Jr., and Elizabeth Bowen took a carryover basis of $0.3501 per share in the Industrial-America stock received in exchange for that portion of Telfair stock that represented their original one-third ownership of the corporation.

Substantially all of the Industrial-America stock owned by James Stockton and Mr. and Mrs. Bowen was "lettered stock" which bore the following legend on the face of the certificates: "The shares represented by this certificate have not been registered under the Securities Act of 1933, and they may not be transferred except upon compliance with or exemption from that Act." Mr. Bowen understood this to mean that the directors and officers of Industrial-America who were issued such stock could trade it only in a private transaction.

In order to help finance their purchase of the 254,564 shares of Industrial-America stock, James Stockton, Jr., and Mr. and Mrs. Bowen collectively borrowed $1,700,000 from the Gulf Life Insurance Co. (hereinafter Gulf Life), an indebtedness for which they incurred joint and several liability. A substantial portion of the Industrial-America stock held by the shareholders was pledged by them to Gulf Life as security for the loan. Additionally, as a further inducement to make the loan, Gulf Life was granted an option to purchase 40,000 shares of Industrial-America stock.

As a convenient vehicle for holding assets distributed to the shareholders during the reorganization and for facilitating the payment of their respective obligations on certain liabilities, including the Gulf Life indebtedness, James Stockton, Jr., and Mr. and Mrs. Bowen established the "Stockton and Bowen Joint Account" in 1969. From 1969 through 1972, the activity in the joint account, which included the making of principal and interest payments on the Gulf Life indebtedness, was reported for Federal income tax purposes by the filing of partnership returns.

As of August 13, 1973, there was an outstanding balance on the Gulf Life indebtedness of $1,520,000. During the period from 1969 to August 13, 1973, James Stockton, Jr., and Mr. and Mrs. Bowen agreed among themselves to assume the obligation to pay principal and interest to Gulf Life in proportion to the relative amount of Industrial-America stock that each purchased with the loan proceeds in the reorganiza-

tion between Telfair and Industrial-America. In other words, James Stockton, Jr., and Mr. and Mrs. Bowen agreed among themselves to assume one-half, one-sixth, and one-third of the liability, respectively.

Following the reorganization, Industrial-America continued to function as a holding company owning various corporations, and was engaged principally in the industrial distribution business on the east coast and in the forest products business on the west coast.

One of the consequences of the merger was a change in the management of Industrial-America. Despite James Stockton's status as largest stockholder, Mr. Bowen was able to attain and hold the top executive post of the company through the combined voting power of his, his wife's, and Mr. Orr's stock. Mr. Orr gave almost unqualified support to Mr. Bowen's leadership, believing that it was imperative that he have effective control over the corporation. Mr. Bowen virtually was assured the voting power of his wife's stock since she freely permitted him to vote it by proxy.

From the date of the Telfair merger until the present, Mr. Bowen has held the positions of director, president, and chief executive officer of Industrial-America and, over the same period, James Stockton, Jr., has served as director on Industrial-America's board. Mr. Stockton also served as vice president of the company until his resignation in 1975, but has not held an executive position with the company at any time since then. At no time has Mrs. Bowen served in the capacity of either director, officer, or employee of Industrial-America.

After the merger, Mr. Stockton was not directly involved in the active management of Industrial-America, but was involved principally in the management of a wholly owned subsidiary of Industrial-America named Stockton Properties, Inc. The subsidiary corporation, formed in 1971 under Florida law, was a general partner in Sawgrass, Ltd. (hereinafter Sawgrass), a Florida limited partnership engaged in the development of a multimillion dollar residential resort at Ponte Vedra Beach, Fla. Based on a feasibility study prepared on behalf of Industrial-America, the prospects for Sawgrass appeared excellent. The study indicated a potential return on investment of anywhere between 30 to 50 percent.

Throughout 1973 and into early 1974, Sawgrass lived up to its expectations, and thereby yielded a sizable return to its general partner, Stockton Properties, Inc., and the parent thereof, Industrial-America. In its report to shareholders for the fiscal year ended February 28, 1974, Industrial-America reported over $15 million in sales from the real estate development which produced a sizable profit for the year. However, the prosperity was not to last. With the advent of the depression of the real estate market in 1974, Sawgrass' fortunes plummeted, causing it to experience severe financial difficulties. As the situation worsened, the normally "cordial" relationship between Mr. Bowen and Mr. Stockton became strained. This was due to a disagreement over the proper direction that Industrial-America should take. It was Mr. Stockton's opinion that the real estate venture eventually would return to prosperity and that it therefore should be retained under all circumstances. This was contrary to Mr. Bowen's convictions, for he had a greater interest in the industrial operations of Industrial-America and was of the belief the company would not be able to survive the rapid decline of Sawgrass.

Eventually, with the aid of the majority voting power that was amassed behind him, Mr. Bowen prevailed and was able to effect a return of the slumping Sawgrass to the creditor banks while continuing the remaining businesses of the company without interruption. Thus, on November 4, 1975, the Sawgrass property was conveyed back to the lending banks along with notes issued by Industrial-America in the face amount of $4 million in exchange for cancellation of additional indebtedness. As a result of the failure of Sawgrass, the chairman of the board of directors of Industrial-America, a vice president and director of Industrial-America, and James Stockton, Jr., who was also a vice president of Industrial-America, all resigned.

From the date of the reorganization until December 1972, James Stockton, Jr., and Mr. and Mrs. Bowen made occasional sales of relatively small amounts of stock to, for the most part, officers coming into the company or other close parties. The number of shares sold during this period was as follows:

|             | 1969   | 1970   | 1971   | 1972    | Total   |
|-------------|--------|--------|--------|---------|---------|
| Mr. Stockton | 20,000 | ---    | 19,500 | 62,125  | 101,625 |
| Mr. Bowen   | 6,667  | ---    | 5,300  | 13,500  | 25,467  |
| Mrs. Bowen  | 13,333 | 10,000 | 2,000  | 49,125  | 74,458  |
| Total       | 40,000 | 10,000 | 26,800 | 124,750 | 201,550 |

The sales by the Bowens during 1971 and 1972 were made primarily for the purpose of raising cash to satisfy debts.

Mr. Bowen was aware that he might inadvertantly lose control of Industrial-America through the aggregate effect of the numerous stock sales and therefore he kept a close watch over the relative ownership of the stock. For the period from 1970 through 1973, the following chart reflects the number of Industrial-America shares owned by James Stockton, Jr., and the Bowens as of the record dates for Industrial-America's annual stockholders' meetings:

| Date    | James Stockton, Jr. | Mrs. Bowen | Mr. Bowen |
|---------|---------------------|------------|-----------|
| 6/1/70  | 536,613             | 357,076    | 178,837   |
| 6/1/71  | 522,113             | 345,076    | 178,837   |
| 6/1/72  | 483,613             | 309,076    | 175,537   |
| 5/23/73 | 459,988             | 276,451    | 165,037   |

Thus, with slight variations, the relative stock ownership as among the three shareholders remained in the approximate amount of one-half owned by Mr. Stockton, one-third owned by Mrs. Bowen, and one-sixth owned by Mr. Bowen.

Mrs. Bowen took no active interest in the affairs of Industrial-America during her entire period of stock ownership in that corporation. Her disinterest was known to her husband, her brother, Mr. Orr, and Mr. Kenneth L. Pray, Mrs. Bowen's banker and financial advisor. She did not attend stockholder meetings and allowed her husband to vote her stock by proxy. Her single interest in the activities of Industrial-America was produced by her belief that the Sawgrass project was an excessively risky venture. Because of this attitude, she was insistent upon severing her connections with Sawgrass, even if that meant disposing of her Industrial-America stock.

Mrs. Bowen was not dependent upon Industrial-America as a source of income, for, in addition to her interest in the corporation, she was the owner of a gift shop and was the beneficiary of several trusts. As a result, Mrs. Bowen's net worth exceeded $2 million in 1973.

At sometime in early 1973, Mr. Bowen approached his wife with an offer to buy her stock. Such acquisition by him would have solidified his control over the corporation. At that time, he and his wife were encountering certain marital difficulties which Mr. Bowen believed would have put him in a "very embarrassing position" had they continued. The proposed purchase would have left him with virtually the same percentage of stock ownership as Mr. Stockton's. This, coupled with Mr. Orr's unwavering support, would have assured Mr. Bowen of effective control despite a possible breakdown of his marriage. Such control could not have been acquired in the open market since Industrial-America was a closely held corporation, 90 percent of the stock of which was held by 10 to 12 people. Aside from the control ramifications, Mr. Bowen also believed that the purchase was a good investment. At the time of his offer, the company's outlook was rosy.

In structuring the terms of the sales transaction, Mr. Bowen consulted the accounting firm of Arthur Young & Co., which also handled the accounting needs of Industrial-America. Mr. Bowen initially wished to purchase his wife's stock in a private annuity transaction similar to the one in which he purchased the stock of his father-in-law, Mr. James Stockton, Sr. Arthur Young & Co. explored several alternative financing arrangements for the stock purchase, including an annuity transaction, and relayed their findings by letter to Mr. Bowen. After reviewing them, Mr. Bowen concluded that he would not be able to afford the annual payments that would be required under the proposed arrangements. At that time, he derived virtually all of his income from Industrial-America in the form of salaries, bonuses, and dividends, and the total amount received was estimated to be insufficient to meet the payments required under a private annuity transaction. Therefore, Mr. Bowen requested Arthur Young & Co. to structure the sales contract in a manner similar to an annuity but which would require him only to make payments in amounts he could afford. Mr. Bowen determined that he could pay his wife approximately $40,000 a year for the stock.

Arthur Young & Co. responded by structuring an installment purchase based upon Mr. Bowen's ability to pay $40,000 per year. Using an amortization schedule and gearing pay-

ments to the then-approximate 40-year life expectancy of Mrs. Bowen,[2] a contract was devised whereby Mr. Bowen would pay approximately $40,000 per year to his wife for 40 years, at the end of which time he would make a large "balloon" payment.

Mr. Bowen also received tax advice from Arthur Young & Co. He was advised not to purchase Mrs. Bowen's high-basis stock ($10-basis stock) since the loss would not have been recognizable under section 267 of the Internal Revenue Code. However, Mr. Bowen insisted on purchasing all of his wife's stock, and consequently the sale was divided into two separate contracts, one for the purchase of Mrs. Bowen's high-basis stock and one for the purchase of her low-basis stock.

The consideration set for the stock was $5 per share, which was the approximate book value of the stock in early 1973. (The actual book value as of February 28, 1973, was $5.11 per share.) The following chart reflects the daily quotes of Industrial-America stock as reported in financial publications:

| Date | Bid | Ask |
|------|-----|-----|
| Jan. 3, 1973 | 7¾ | 8½ |
| Aug. 10, 1973 | 8 | 8 |
| Aug. 14, 1973 | 8 | 8¼ |
| Dec. 30, 1973 | 5 | 5 |
| Apr. 2, 1974 | 6¾ | 7¾ |
| Dec. 31, 1974 | 2½ | 3½ |
| Dec. 31, 1975 | ⅝ | 1⅛ |
| Dec. 31, 1976 | 1 | 1⅜ |
| Dec. 31, 1977 | 1½ | 1⅞ |
| Dec. 29, 1978 | 3⅝ | 4 |
| Dec. 29, 1979 | 3 | 3½ |

Mr. Bowen was aware that the market value of Industrial-America stock was in the vicinity of $7 per share but stated at trial that he had concluded that the fair market value of the specific block of stock that he purchased was better approximated by its book value. This sprang from his belief that such a large quantity of restricted stock could not command the

---

[2]Mr. Bowen was born on Aug. 20, 1926, and Mrs. Bowen was born on March 13, 1933. The actual life expectancy of Mrs. Bowen in early 1973 as reflected by the United States Life Tables from the Florida Code was 38.5 years. The life expectancy of Mr. Bowen was 26.3 years.

same per-share price as the smaller blocks of unrestricted stock then being traded over the counter.

An interest rate of 4 percent was selected to apply to the deferred payments under the sales contract. This amount was the minimum rate that could be charged without triggering the imputation of interest at 5 percent under section 483. In September 1973, the average long-term interest rate for home mortgages was 8.1 percent and for short-term prime commercial loans it was 10.2 percent.

As stated, the sales transaction was broken into two separate transactions. Pursuant to the first agreement, Mrs. Bowen was to transfer 44,022 shares of Industrial-America stock to Mr. Bowen for a total purchase price of $220,110 (or $5 per share). Mr. Bowen was to pay $100 down and assume $220,010 of Mrs. Bowen's individual indebtedness in payment for the stock. Mrs. Bowen had a $10-per-share basis in the 44,022 shares to be transferred to her husband under the first agreement.

Pursuant to the second agreement, Mrs. Bowen was to transfer 232,429 shares of Industrial-America stock to Mr. Bowen for a total purchase price of $1,162,145 ($5 per share). Mr. Bowen was to pay the purchase price in the following manner:

(a) The sum of $100 in cash;

(b) The assumption by Mr. Bowen of $81,370 of his wife's individual indebtedness; and

(c) The balance of $1,080,675 in semiannual installments over a 40-year period, with a "balloon" payment due at the end of the 40-year period. The pertinent provisions of the agreement relating to the installment obligation provided as follows:

The sum of $1,080,675.00 (the "deferred balance") together with interest at the rate of 4% per annum in eighty (80) semi-annual installments of principal and interest. The first such payment in the amount of $20,100.00 (less the $100.00 paid simultaneously herewith) shall be due and payable on September 15, 1973. Thereafter, 78 equal semi-annual installments of principal and interest each in the amount of $19,340.24 shall be due and

payable on March 15 and on September 15 of each year and a final payment of $1,453,191.09 shall be paid on March 15, 2113.[3] Buyer [Mr. Bowen] shall have the right to prepay up to $337,000.00 of the deferred balance during the calendar year of 1973. No prepayment during the calendar year of 1973 in excess of said amount shall be permitted. The deferred balance may be prepaid in part or in full at any time after January 1, 1974. All such payments on the deferred balance shall be applied first against accrued interest and then on the principal.

Mrs. Bowen had a $0.3501-per-share basis in the 232,429 shares to be transferred to her husband under the second agreement.

The "balloon" payment stated in the agreement in the amount of $1,453,191.09 could, in the opinion of Arthur Young & Co., have been stated as $300,000 plus accrued interest. Mr. Bowen's obligation to his wife was to be unsecured.

After the terms and provisions of the purchase agreements were found to be satisfactory, the sales contracts were drafted by Mr. Bowen's attorney, from whom Mr. Bowen received no tax advice. Both sales contracts contain representations by Mr. Bowen that he was acquiring the stock for his own account and not with a view of reselling or otherwise distributing all or part of the stock except as may be permitted under the Securities Act of 1933. The agreements also recite that they are to be construed in accordance with the laws of Florida.

After formulating the terms of the sales contract, Mr. Bowen approached Mr. Kenneth L. Pray to make sure that Mrs. Bowen was receiving fair treatment under the agreement. Mr. Pray was an experienced trust officer and vice president with the Atlantic National Bank of Jacksonville, Fla. Shortly after 1969, he assumed responsibility for all of the Stockton and Bowen accounts. The various accounts handled by Mr. Pray on behalf of the bank consisted of Mr. Stockton's marital and residual trusts, separate trusts for Mrs. Bowen and James Stockton, the Stockton Foundation, and several trusts which had been created for the Bowen children. Mr. and Mrs. Bowen also kept their Industrial-America stock certificates that had not been pledged to Gulf Life at the Atlantic

---

[3]The final payment stated to be due on "March 15, 2113" is a typographical error and should read "March 15, 2013." The correction was made in the stipulation executed between Mr. and Mrs. Bowen and filed in connection with their divorce proceedings.

National Bank in a "custodian account." This account was also administered by Mr. Pray.

Over the years, Mrs. Bowen relied both upon her husband and upon Atlantic National Bank for advice in her financial and investment activities. Mr. Bowen was cotrustee, along with the bank, of his wife's various trusts during the years in question and has continued as such up until the present. Her advice from the bank had come almost exclusively from Mr. Pray ever since the time he took over the Bowens' account. Thus, Mrs. Bowen generally did not enter into any financial transaction without the prior approval of both the bank and her husband. Cognizant of this, Mr. Bowen never took any action with respect to his wife's assets without first consulting the bank, as he did in the case of the stock sale.

Mr. Pray was of the opinion that the sales contract was fair to Mrs. Bowen. He based his opinion upon a number of facts. First of all, he was skeptical about the stability of the corporation, for he perceived the future of the company to be in serious doubt. He believed that under such circumstances, the Industrial-America stock was a poor investment for Mrs. Bowen to hold, especially as a minority shareholder. Industrial-America's poor dividend record reinforced this view. Mr. Pray also attached significance to the fact that Mrs. Bowen's stock was, for the most part,[4] "lettered stock," believing that such restriction greatly reduced the marketability of the stock.[5] Finally, Mr. Pray was aware that Mrs. Bowen's interests were directed toward her separate business, the gift shop, rather than toward Industrial-America. Believing that the transaction was fair to Mrs. Bowen, and in light of the above considerations, Mr. Pray gave his approval to the sale. Mr. Pray stated at trial that, if he had believed that the transaction had been somehow unfair to Mrs. Bowen, he would

---

[4]Mrs. Bowen owned about 500 shares of Industrial-America stock that did not contain this legend.

[5]The restriction did not prevent the sale by Mrs. Bowen to her husband, however. In a letter dated Aug. 20, 1973, counsel for Industrial-America rendered an opinion to the effect that the transfer of shares to Mr. Bowen was an "exempt transaction" under the Securities Act of 1933 and that the transfer could be completed provided an "investment legend" was placed on the new certificates issued to Mr. Bowen. The letter was addressed to Mr. Pray at the Atlantic National Bank.

have advised her not to go through with it since he knew how heavily she relied upon his advice.

Mr. Bowen also discussed the prospective sale with James Stockton, Jr., his wife's brother. Thereafter, Mr. Bowen presented the terms of the contract to his wife. He explained to her that he had consulted Mr. Pray and Mr. Stockton and that Mr. Pray had given his approval to the transaction.

At the time of the sale, Mrs. Bowen owned a gift shop called "The Shop of John Simmons." Since 1970, she had actively participated in the management and operation of the shop and was responsible for the buying, hiring, firing, daily bookkeeping, ordering, and stock work. Despite her efforts, the shop was financially unsuccessful, and Mrs. Bowen lost between $15,000 and $30,000 per year from the business. The installment contract proposed by her husband was especially attractive to her since the $40,000 yearly payments under the contract would be sufficient to offset her business losses, and therefore would allow her to continue the operation of the shop. The sales contract also appealed to her strong desire to sever her ties with the Sawgrass project. As a consequence, and because she relied so heavily upon the advice of her husband and her banker, Mrs. Bowen willingly assented to the sales contract as presented to her by her husband.

Pursuant to two separate documents dated August 13, 1973, Mrs. Bowen transferred all of her Industrial-America stock consisting of 276,451 shares to Mr. Bowen for the consideration stated in the agreements. As stated, part of this consideration included the assumption by Mr. Bowen of $301,380 of Mrs. Bowen's individual indebtedness on the Gulf Life note. Thereafter, as agreed between themselves, the individual liabilities of Mr. James Stockton, Jr., Mrs. Bowen, and Mr. Bowen were, respectively, 50 percent, 13.5057 percent, and 36.4943 percent of the total.

The stock that was transferred by Mrs. Bowen continued to be encumbered by the Gulf Life stock pledge agreement in the same manner and to the same extent after the sale as it was before the sale. Mr. and Mrs. Bowen's joint and several liability (as opposed to their individual liabilities as agreed upon between themselves) to Gulf Life also remained unchanged.

Prior to the transfer, the 276,451 shares of Industrial-America stock were the separate property of Mrs. Bowen. Legal title to the stock was transferred to Mr. Bowen pursuant to the transaction. Accordingly, Mrs. Bowen surrendered the stock certificates in her name and new ones were issued in the name of her husband. Florida transfer taxes in the amount of $518.34 were paid on the purported sale by the Atlantic National Bank out of Mrs. Bowen's trust.

The computation of realized gain and loss on the two sales, for purposes of reporting the transaction on Mrs. Bowen's 1973 Federal income tax return, was made as follows:

### Agreement No. 1

| Number of shares sold | Total consideration | | Type of consideration |
|---|---|---|---|
| 44,022 | $220,110 | $100 | cash down |
| | | 220,010 | loan assumed |
| | | 220,110 | amount realized |
| | | (440,220) | basis |
| | | 220,110 | loss |

### Agreement No. 2

| Number of shares sold | Total consideration | | Type of consideration |
|---|---|---|---|
| 232,429 | $1,162,145 | $100 | cash down |
| | | 81,370 | loan assumed |
| | | 1,080,675 | "deferred balance" |
| | | 1,162,145 | amount realized |
| | | (81,370) | basis |
| | | 1,080,775 | gain realized |

Mrs. Bowen elected to report the gain derived on the transfer to Mr. Bowen under the installment method of reporting on their joint 1973 Federal income tax return. The $220,110 loss realized by Mrs. Bowen was not recognized in computing her gain and loss on the sale due to the disallowance provisions of section 267.

Mrs. Bowen's gross profit percentage as reported in the installment sale schedule was 100 percent. She received principal payments from Mr. Bowen in 1973 on the installment obligation in the amount of $31,938.44 and recognized the entire amount as capital gain in that year. The 1973

return, and the installment sale schedules reflecting the sale, were prepared by Arthur Young & Co.

At sometime in early 1974, Industrial-America's forest products company, which is based in Portland, Ore., developed an interest in obtaining the licensing arrangement for a waste-fired burner to be used with dry kilns. Such a device was owned and patented by a California corporation called Energex, Ltd. (hereinafter Energex). Upon inquiry, it was discovered that a corporation called MacMillan Bloedell, Ltd. (hereinafter MacMillan), was the controlling shareholder of Energex. Industrial-America contacted MacMillan and soon learned that MacMillan was interested in the prospect of acquiring a forest products division. Negotiations for a possible sale to MacMillan of Industrial-America stock and a concomitant purchase by Industrial-America of the stock of Energex commenced in late April of 1974.

On June 13, 1974, and June 14, 1974, Mr. Bowen and James Stockton, Jr., met with John L. Dickinson and Ralph L. Gillen, officials of MacMillan, at its offices in Vancouver, British Columbia, to discuss with them the business of MacMillan, its financial condition, and the results of its operations over the past several years. MacMillan was at that time Canada's largest forest products concern.

MacMillan initially agreed to purchase the Industrial-America stock for $10 per share. However, due to the uncertainty surrounding Sawgrass, Mr. Bowen and Mr. James Stockton, Jr., were required, as a condition of the sale, to sign documents that obligated them to accept a reduced purchase price in the event that the net worth of Sawgrass fell. At the meeting of the board of directors of Industrial-America on December 16, 1974, with Mr. Bowen and Mr. Stockton present, the board adopted a resolution approving the transfer of stock to MacMillan for $10 per share. This resolution ratified the stock purchase agreement that previously had been negotiated by the parties.

Thereafter, on or about December 20, 1974, MacMillan purchased 187,500 shares of common stock each from Mr. Stockton and Mr. Bowen. In addition, MacMillan purchased 100,000 shares of common stock directly from Industrial-America. The sales price, as adjusted, totaled $1,237,500, or $6.60 per share. The original sales price of $10 per share was

adjusted downwards to the price of $6.60 per share pursuant to the provision in the stock purchase agreement authorizing such adjustment in light of the dismal conditions in the real estate market that arose between the original contract negotiations and the carrying out of the contract. MacMillan had discovered by consulting Lehman Bros. of New York that the Sawgrass project was in serious trouble. As a result of the stock purchase, MacMillan acquired approximately 28 percent of Industrial-America's issued and outstanding common stock.[6] In a separate document incorporated in the sales agreement entitled "Industrial-America Corporation Shareholders Agreement," the contracting parties established provisions for the election of directors and the future transfer of Industrial-America stock. The purchase by MacMillan complemented MacMillan's simultaneous sale of its interest in Energex to Energex-Florida, Ltd., a subsidiary of Industrial-America.

In consideration for his stock, Mr. Bowen received $1,000 in cash from MacMillan, MacMillan's 8½-percent promissory note in the face amount of $187,500, due December 19, 1975, and MacMillan's 8½-percent unsecured subordinated convertible debenture, in the face amount of $1,049,000, due December 20, 1984.

As stated above, at the time of the interspousal transfer on August 13, 1973, Mrs. Bowen held 44,022 Industrial-America shares at a basis of $10 per share, and 232,429 shares at a basis of $0.3501 per share. Due to the surrender of the stock certificates to Mr. Bowen, it cannot now be determined whether the stocks subsequently sold by Mr. Bowen represented the high-basis stock or the low-basis stock of Mrs. Bowen that was transferred to Mr. Bowen.

Mr. Bowen elected to report the gain realized on the sale of stock to MacMillan under the installment method on the joint Federal income tax return filed by petitioners. Of the 187,500 shares sold by Mr. Bowen, 175,240 shares were purchased from Mrs. Bowen on August 13, 1973. In reporting the gain from the sale of the 175,240 shares, Mr. Bowen computed a basis per share of $5 per share (his cost basis) plus an allocation of

---

[6]MacMillan acquired a 28-percent interest in Industrial-America for financial accounting purposes.

$0.796203 per share from the unrecognized loss realized on the purchase of stock from Mrs. Bowen.[7] Accordingly, the basis of the stock sold by Mr. Bowen reported on petitioners' joint 1974 and 1975 Federal income tax returns was computed as follows:

| | |
|---|---|
| 12,260 Shares at $10 per share .................. | $122,600.00 |
| 175,240 Shares at $5.796203 per share .......... | 1,015,726.60 |
| Cost of sale............................................ | 300.00 |
| Total basis ...................................... | 1,138,626.60 |

Prior to the negotiations with MacMillan in April of 1974, Mr. Bowen had never heard of MacMillan. Mr. Bowen did not discuss with his wife the sale of his stock to MacMillan, and she was completely unaware of the terms of the transaction.

After the sale, Mr. Bowen was successful in retaining effective control of the corporation. The MacMillan directors gave him virtually absolute support in his management of Industrial-America. As a result of the Sawgrass fiasco, Mac-Millan eventually lost interest in Industrial-America and at present owns no stock in the corporation.

With the exception of the stock sold to MacMillan, Mr. Bowen still owns the stock he received from Mrs. Bowen in 1973. At the time of trial, Mr. Bowen was Industrial-America's largest shareholder, occupying the positions of president, chairman of the board, and chief executive officer.

Mr. and Mrs. Bowen were married in 1957. They maintained separate bank accounts in each of their names and also maintained a joint account for convenience' sake. On July 1, 1980, a final judgment of dissolution of marriage was entered by the Circuit Court of St. Johns County, Fla., dissolving the marriage of Mr. and Mrs. Bowen. Mr. Bowen continues to serve as cotrustee of his ex-wife's various trusts.

In connection with their divorce proceedings, Mr. and Mrs. Bowen executed a stipulation dated May 21, 1980, for purposes of settling their financial affairs, which fully recognized Mr. Bowen's obligation under the sales agreement. The stipulation was approved and incorporated in the final judgment of

---

[7]Respondent acknowledges that if the interspousal transfer is recognized as a sale for Federal income tax purposes, the basis reported in the stock sold to MacMillan by Mr. Bowen is correct. See sec. 1.267(d)–1(b)(3)(ii), Income Tax Regs.

dissolution of marriage entered by the court on July 1, 1980. Further, the final judgment provided:

On or about August 13, 1973, respondent (Mrs. Bowen) sold to petitioner (Mr. Bowen) certain shares of Industrial America Corporation stock previously owned by respondent pursuant to certain Purchase and Sale Agreements between them. Petitioner shall continue to discharge the cash payment obligation of said Purchase and Sale Agreements until the indebtedness is discharged in full.

Since the date of the stock sale, Mr. and Mrs. Bowen have consistently treated the contract debt arising under the sales agreement as a bona fide debt. In executing the contract, Mrs. Bowen fully expected Mr. Bowen to fulfill all of his contractual obligations and, to date, such expectations have been realized.

Mr. Bowen's personal financial statements, given to various financial institutions in years subsequent to 1973, consistently reported his contract debt to Mrs. Bowen. In a financial statement given to the Barnett Bank in applying for a $600,000 loan, for example, Mr. Bowen listed the contract to Mrs. Bowen as a liability in the amount of $1 million, and in the "Estimate of Annual Expenses," he listed a $40,000-per-year annuity. Due to Mr. Bowen's original concept of the stock purchase transaction, he continued to regard his debt to Mrs. Bowen in the nature of an annuity. Mr. Bowen listed his contract debt to Mrs. Bowen on the financial statements because he regarded it as a "firm obligation."

On their 1975 joint Federal income tax return, petitioners reported a portion of the payments made by Mr. Bowen to his wife as interest income to Mrs. Bowen. This income was offset by an interest expense deduction by Mr. Bowen in equal amount. The remaining portion of the payments were reported by Mrs. Bowen as long-term capital gain.

In the statutory notice, respondent asserted that (1) there was no bona fide purchase or sale under the terms of the second agreement dated August 13, 1973, whereby Robert Bowen agreed to buy and Elizabeth Bowen agreed to sell 232,429 shares of Industrial-America Corp. common stock; (2) such agreement had no Federal income tax consequences; and (3) Elizabeth Bowen realized no taxable capital gain as a result of such agreement. As a result, respondent determined that Mr. Bowen should recognize a long-term capital gain of $159,575.81 in 1975 from the installment sale in 1974 of

187,500 shares of Industrial-America stock to MacMillan instead of the $14,921 capital gain as reported by Mr. Bowen on petitioners' joint 1975 return. Mr. Bowen's capital gain from the MacMillan sale was increased since he was denied the benefit of the increment in basis that would have accrued to him had respondent recognized the interspousal transfer for tax purposes.

Due to the above adjustments, petitioners' capital gains were recomputed and their income was increased by $63,825.56. Since it was concluded by respondent that the terms of the second purchase and sales agreement dated August 13, 1973, were not bona fide, the interest income reported by Mrs. Bowen under such agreement in the amount of $58,131.26 was determined not to be includable in her income for 1975, and the interest expense reported by Robert Bowen under such agreement in the amount of $58,131.26 was determined not to be deductible from income in 1975. Accordingly, income for 1975 was increased and decreased by the same amount, resulting in a wash on the joint return.

As a result of petitioners' increased income for the taxable year 1975, respondent determined that investment credit in the amount of $158.20 was allowable for such taxable year and therefore not allowable as an investment credit carryback to the taxable year 1973, as previously reported by petitioners.

Accordingly, respondent determined deficiencies of $10,724.42 for the taxable year 1975 and $158.20 for the taxable year 1973. Additionally, respondent determined an addition to tax under section 6653(a) in the amount of $536.22 for the taxable year 1975.

## OPINION

We are called upon to decide whether an interspousal stock sale made under the installment method had sufficient substance to allow its form to be respected for tax purposes. As the findings of fact are lengthy, we will repeat here for convenience the particularly material facts. The stock which is the subject of the disputed sale had its genesis in 1964, when Mrs. Bowen's father formed Telfair Corp. Ownership of the corporation was divided equally between Mrs. Bowen's father, a trust for the benefit of Mrs. Bowen, and a trust for the benefit of Mrs. Bowen's brother, Mr. Stockton. Mrs. Bowen's

father subsequently sold his one-third interest to Mr. Stockton and to Mr. Bowen, with each purchasing one-half of the total stock sold. This transaction left Mr. Stockton with 50-percent ownership of the corporation and the Bowens with the other 50-percent (Mrs. Bowen with one-third and Mr. Bowen with one-sixth).

In 1969, Telfair merged with Industrial-America, a publicly held corporation. The former Telfair shareholders received Industrial-America stock in exchange for their conveyance to that corporation of the assets of Telfair. They also purchased additional Industrial-America stock at a price of $10 per share. In order to finance this purchase, the three shareholders collectively borrowed $1,700,000.

After the merger, the Bowens and Mr. Stockton held an aggregate of 70 percent of the Industrial-America stock. The percentage of Industrial-America stock each received reflected his proportionate ownership of Telfair. Thus, Mr. Stockton owned 35 percent of the Industrial-America stock while the Bowens together owned 35 percent. Substantially all of the Industrial-America stock owned by Mr. Stockton and the Bowens bore on its face certain restrictions against conveyance.

In early 1973, Mr. Bowen approached his wife with an offer to buy her Industrial-America stock. Mr. Bowen was aware of Mrs. Bowen's desire to dispose of her stock, for her sole interest in the corporation lay in her aversion to a real estate project in which the corporation was involved. After consulting an accounting firm, Mr. Bowen came up with a proposal that would allow him to purchase his wife's stock under the installment method. The proposed contract provided for a two-step transfer. Pursuant to the first agreement, Mrs. Bowen was to transfer 44,022 shares of stock to her husband for $220,110 ($5 per share). All but $100 of this consideration was to be paid by Mr. Bowen's assumption of his wife's individual indebtedness. Pursuant to the second agreement, Mrs. Bowen was to transfer the remainder of her stock, 232,429 shares, to Mr. Bowen for a total purchase price of $1,162,145 (also $5 per share). Mr. Bowen was to pay this amount by making a downpayment of $100 in cash, by assuming $81,370 of his wife's individual indebtedness, and by paying the balance in semiannual installments over a 40-year period with a "bal-

loon" payment at the end. The yearly installments would total $38,680.48 and would be comprised of both principal and interest. The final payment would total $1,453,191.09 and would also be comprised of both principal and interest. The stated interest rate to be paid by Mr. Bowen was 4 percent. His obligation to his wife was to be unsecured.

Mr. Bowen consulted his and his wife's financial adviser for assurance that his wife was receiving fair treatment under the contract. Thereafter, he presented the contract to Mrs. Bowen, who readily accepted the terms. Thus, on August 13, 1973, Mrs. Bowen transferred all of her Industrial-America stock to her husband for the consideration stated in the contract. Mrs. Bowen reported her gain on the installment method on the Bowens' 1973 joint Federal income tax return.

In early 1974, Industrial-America became interested in acquiring the use of a waste-fired burner to be used with dry kilns. Upon investigation, Industrial-America located a corporation that owned and patented such a device. This corporation, called Energex, was controlled by a larger corporation called MacMillan. Contact with MacMillan revealed a desire by that company to purchase Industrial-America stock. After negotiations, an arrangement was formulated whereby Industrial-America would purchase the stock of Energex and MacMillan would purchase 28 percent of Industrial-America's stock. Thereafter, on or about December 20, 1974, MacMillan purchased 187,500 shares of common stock from Mr. Bowen and the same quantity from Mr. Stockton. In addition, MacMillan purchased 100,000 shares of common stock directly from Industrial-America. The sales price of the stock was set at $6.60 per share. In consideration for this stock, Mr. Bowen received $1,000 in cash, and an 8½-percent promissory note in the face amount of $187,500 due in 1 year, and an 8½-percent unsecured debenture in the face amount of $1,049,000, due 10 years from the date of sale. Mr. Bowen elected to report the gain under the installment method.

Respondent challenges petitioners' tax treatment of the two sales on the grounds that the first sale was not a bona fide transaction and, therefore, should not be recognized for Federal income tax purposes. Consistent with this view, respondent argues that the second sale should be taxable as if made directly by Mrs. Bowen and, therefore, should not

receive the benefit of a basis boost as a result of the interspousal transfer.[8]

Generally, a sales transaction is treated as such for tax purposes. However, things are not always what they seem. When the underlying facts indicate that the purported sale is something other than that which it appears, then different treatment may follow. In our context, such treatment is typically authorized by one or more of several judicial doctrines. Here, respondent asserts that the contested transfer cannot withstand the thrust of the substance-over-form doctrine.

Petitioners' filing of a joint return does not fuse them into a single taxpayer; their status as individuals is retained. *Wrenn v. Commissioner*, 67 T.C. 576, 585 (1976); *Dolan v. Commissioner*, 44 T.C. 420, 430 (1965). Thus, transactions entered into between married couples filing jointly normally are not denied recognition for tax purposes.[9] However, in testing the reality of sales transactions, sales between family members are to be scrutinized with greater skepticism than sales between unrelated parties. *Lustgarten v. Commissioner*, 71 T.C. 303, 309 (1978), affd. 639 F.2d 1208 (5th Cir. 1981); *Wrenn v. Commissioner, supra* at 584. This is because of the greater potential for complicity between related parties in arranging their affairs in a manner devoid of legitimate motivations.

The burden of proving the existence of a sale is upon petitioners. Rule 142(a), Tax Court Rules of Practice and Procedure; *Wrenn v. Commissioner, supra* at 582. Determination of the existence or nonexistence of a sale must be based upon all of the facts and circumstances. *Wrenn v. Commissioner, supra* at 584.

Structuring one's affairs so as to minimize taxes is not in itself a condemned practice. Within the realm of legality, "one

---

[8]Had these facts arisen after May 14, 1980, the interspousal sale would have been subject to the resale provisions of sec. 453(e), adopted by the Installment Sales Revision Act of 1980. As such, the second disposition would have triggered accelerated gain recognition by the initial seller to the extent provided in the statute. However, "no inference [should] be drawn from these provisions as to the proper treatment of any related party installment sale occurring prior to the effective date provided under the bill." S. Rept. 96–1000 (1980), 1980–2 C.B. 494, 503.

[9]Under Florida law, married parties have the capacity to enter contracts between themselves. Fla. Stat. Ann. sec. 708.09 (West Supp. 1981).

may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir. 1934), affd. 293 U.S. 465 (1935). See also *Williams v. United States,* 219 F.2d 523, 527 (5th Cir. 1955). However, the taxpayer's freedom in this regard is not limited only by his imagination, for there generally must be some substance to a transaction to support its form apart from the tax motive. *Gregory v. Helvering,* 293 U.S. 465, 469 (1935); *Derr v. Commissioner,* 77 T.C. 708 (1981).

It is difficult to draw generalizations from the doctrines of substance over form and of business purpose. This is because they are as broad in application as is the tax law itself and generally are invoked in factual scenarios that do not bear precise repetition.

Respondent makes a two-pronged attack upon the purported sale of stock between Mr. and Mrs. Bowen. He argues that the transaction is a sham unless (1) there were valid nontax reasons for entering the transaction, and (2) the terms and conditions were fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length. Respondent contends that the interspousal transfer lacks the substance of a sale and therefore should not be treated as such.

The substance-over-form doctrine in the field of tax law was recognized by the Supreme Court as early as 1921, when it declared, "We recognize the importance of regarding matters of substance and disregarding forms in applying the provisions of the Sixteenth Amendment and income tax laws enacted thereunder." *United States v. Phellis,* 257 U.S. 156, 168 (1921). The Fifth Circuit, whose precedent would apply in an appeal of this decision to the new Eleventh Circuit, views the doctrine as "the cornerstone of sound taxation." *Weinert's Estate v. Commissioner,* 294 F.2d 750, 755 (5th Cir. 1961). See also *Lustgarten v. Commissioner, supra.*

A seminal substance-over-form case in the area of intrafamily installment sales is *Rushing v. Commissioner,* 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969). In *Rushing,* two taxpayers each owned 50 percent of the stock of two corporations. Shortly after the adoption by both corporations of a plan

of liquidation, substantially all of the corporate assets of both corporations were sold in transactions that were nontaxable by virtue of section 337(a). The taxpayers then created irrevocable trusts for each of their children and sold their stock in the two corporations to the trusts in installment transactions. Shortly thereafter, the trustee of the trusts liquidated the two corporations and collected the distribution proceeds. The issue was whether the taxpayers could use the installment method to report the gain from the stock sales or whether all gain had to be reported by the taxpayers in the year of receipt of the distribution proceeds. The court stated that "we think it clear * * * that a taxpayer may, if he chooses, reap the tax advantages of the installment sales provision if he actually carries through an installment sale, even though this method was used at his insistence and was designed for the purpose of minimizing tax." *Rushing v. Commissioner, supra* at 598. See also *Williams v. United States, supra* at 527; *Pozzi v. Commissioner*, 49 T.C. 119, 128 (1967). A sale is a sale under this test if the seller parts with direct and indirect control over the object sold and over the proceeds of resale if the buyer resells. Quoting *Griffiths v. Commissioner*, 308 U.S. 355, 357 (1939), the court stated (441 F.2d at 598):

> We cannot too often reiterate that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." Corliss v. Bowers, 281 U.S. 376, 378 * * * . And it makes no difference that such "command" may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. * * *

Because the court in *Rushing* held that the trusts constituted autonomous entities that were not under the control of the selling taxpayers, it held that a sale had in fact taken place and, therefore, installment sale treatment was allowed.

In subsequent trust cases that have applied *Rushing*, independence of the trustee and lack of continuing control over the property sold or the economic benefits therefrom have been decisive. If these factors are present, the transactions will not be telescoped into one so as to deny the initial seller the benefits of section 453. *Goodman v. Commissioner*, 74 T.C. 684, 707 (1980); *Weaver v. Commissioner*, 71 T.C. 443, 452 (1978);

*Roberts v. Commissioner*, 71 T.C. 311, 322 (1978); *Pityo v. Commissioner*, 70 T.C. 225, 236 (1978). On the other hand, where the initial seller of stock has complete control and beneficial use of the proceeds of his buyer-son's subsequent sale of the stock, the initial sale is disregarded and, correspondingly, installment sales treatment is not allowed. *Lustgarten v. Commissioner*, *supra*.

The first case to address the substance of an interspousal sale of property on an installment basis was *Nye v. United States*, 407 F. Supp. 1345 (M.D. N.C. 1975). In *Nye*, respondent contended that the husband acted as agent for his wife for purposes of a subsequent resale of securities by the husband immediately after purchasing them from his wife on an installment basis. Respondent urged that the interspousal sale be disregarded. Applying the *Rushing* control test, the court found that the wife did not directly or indirectly possess control over the resale proceeds or over the economic benefits therefrom. Absent such control or an agency-type relationship, the marriage relationship alone was found to be insufficient grounds for the denial of the benefits of installment reporting.

In testing the substance of the sale of stock between Mr. and Mrs. Bowen, we believe that the transfer is likewise subject to the *Rushing* test. Applying this test, we find that the facts sufficiently establish that Mr. and Mrs. Bowen were independent economic entities for purposes of the interspousal stock sale. By selling her stock, Mrs. Bowen surrendered her control over that stock and over the economic benefits derived therefrom. To conclude otherwise would require us to find that Mr. Bowen was subservient to his wife's desires with respect to the stock. The facts do not support such a finding.

Mr. and Mrs. Bowen had wholly distinct business interests at the time of the stock sale. Mr. Bowen was very active in the affairs of Industrial-America while Mrs. Bowen was occupied with her own business, a gift shop. Neither was actively involved in the business of the other. Mrs. Bowen possessed substantial wealth and Mr. Bowen was not poverty-stricken. They maintained separate checking accounts. Mr. Bowen did not purchase his wife's stock in order to carry out her wishes or to afford her advantageous tax treatment. On the contrary, he purchased the stock to be free of any possibility of her control, and thereby to cement his own control over the stock's

voting power, a control that had become increasingly vulnerable as a result of the Bowens' growing marital discord. Such discord, which eventually resulted in their divorce, further supports the economic separateness of the Bowens.

Since the sale of stock, the Bowens consistently have treated the obligation under the second agreement as binding. The payments required under the contract have been made by Mr. Bowen and, assuming a valid sale, properly reported. Additionally, Mr. Bowen's obligation was incorporated without modification in the Bowens' divorce decree and has consistently been reflected in his financial statements.

The sale and resale were not steps in a prearranged plan. Neither of the Bowens had heard of MacMillan at the time of the interspousal sale. Mr. Bowen's actions subsequent to the first sale were not dictated by his wife. He was not her agent or economic serf, nor did he act as a conduit for the passage of funds from MacMillan to Mrs. Bowen. She had no say over the subsequent disposition of the stock; her only power was the power to enforce the terms of the installment sales contract. For these reasons, we hold that there was sufficient relinquishment of control by Mrs. Bowen in the sale of her stock for such sale to survive the *Rushing* control test.

This does not conclude our inquiry, however, for there is an additional requirement for the tax recognition of the validity of installment sales. According to *Wrenn v. Commissioner*, 67 T.C. 576 (1976), the parties must each have independent reasons beyond those of tax avoidance for entering into the installment sale. The Court declared that:

Our concern is not focused upon the lack of a "business purpose," but upon the lack of any apparent substantive purpose. A valid business purpose undoubtedly would suffice, but more personal motivations could indicate a bona fide transaction as well. [*Wrenn v. Commissioner, supra* at 583.]

In *Wrenn*, the Court concluded that the buyer-wife "had no bona fide reason for entering into the instant transaction other than to assist her husband in his scheme of tax avoidance." *Wrenn v. Commissioner, supra* at 584. Likewise, the Court was not persuaded that the husband had any nontax-avoidance motive for conducting the sale. For these reasons, the sale and resale were collapsed into a single sale, and the seller-husband was denied the benefits of installment reporting.

Unlike the situation in *Wrenn*, both Mr. and Mrs. Bowen had independent nontax reasons for entering the sales transaction. Respondent as much as concedes this in his brief. Mr. Bowen's reasons were purely business in nature. Over the years, Mr. Bowen had held, with the help of the voting power of his wife's stock, a tenuous grip on the control of Industrial-America. It was only natural for him to wish to tighten this grip. Mr. Bowen's continued assurance of his wife's voting power had been eroded by the couple's marital difficulties and by Mrs. Bowen's express desire to divest herself of her Industrial-America stock. The acquisition cemented his control over the corporation and thereby helped enable him to emerge victorious from the internal dispute that was to arise in 1974 as a result of the Sawgrass project. Mr. Bowen also believed that he was making an excellent investment. The existence of Mr. Bowen's desire to solidify his corporate control is not vitiated by the fact that he subsequently sold 187,500 shares of Industrial-America stock to MacMillan, for his acquisition from his wife permitted him to make such a sale without losing control. It is unlikely that Mr. Bowen would have made the sale without the knowledge that Mr. Stockton was selling an equal quantity of stock.

Mrs. Bowen also had nontax reasons for entering the transaction. She had absolutely no desire to retain her stock. To the contrary, she had a strong reason for disposing of it, for she was skeptical of the Sawgrass project to the point of wishing to sever all connection with it. This could most easily be done by selling her stock. Mrs. Bowen sold the shares to her husband in part because it did not seem likely that she would receive any other offers for such a large block of restricted stock. The market for such stock was clearly limited. The yearly installments payable under the contract would provide a steady flow of cash for the operation of her gift shop. Therefore, she found the terms of the contract to be acceptable.

Based on the facts presented, we find that Mr. and Mrs. Bowen had independent nontax reasons for entering the transaction. For this reason, and because we also find that Mrs. Bowen surrendered her control over the stock and over the economic benefits therefrom, we hold that the substance of

the interspousal stock sale comported with its form, and, therefore, that it should be recognized for tax purposes.[10]

Respondent contends that not only must there be valid nontax reasons for entering the transaction, but also that the terms and conditions of the sale must be fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length. At the outset, we must point out that respondent's suggested legal standard does not have the support of case law. In *Sun Properties v. United States*, 220 F.2d 171, 174 (5th Cir. 1955), a case involving an installment sale, the Fifth Circuit declared:

we think it may be stated as a general rule that a transaction must *not* be disregarded simply because it was not at arm's length * * * . And we think it would be judicial legislation of the most inexcusable kind for a court to create such a rule.

See also *Gyro Engineering Corp. v. United States*, 417 F.2d 437, 440 (9th Cir. 1969); *Evans v. Commissioner*, 30 T.C. 798, 807–809 (1958). The cases cited by respondent in support of his proposed legal standard arose in a different context and are not applicable in the case of an interspousal installment sale.

Even absent the judicial precedent, we would feel obliged to reject respondent's arm's-length test. This is because respondent's dual standards are incompatible. The tax-avoidance test articulated in *Wrenn v. Commissioner*, 67 T.C. 576, 584 (1976), is intended to limit the use of installment reporting to situations where there is a nontax reason for the installment sale. The tax advantage of entering such an interspousal transaction is that it defers gain recognition without deferring basis boost. Thus, a subsequent resale produces proceeds without producing gain. However, if the initial seller sells for less than fair market value, then the tax benefits derived from the scheme are diminished since the basis boost is not as great. If Mrs. Bowen had given her stock to her husband, there would be no issue of income tax avoidance since there would be no increase in basis. The transfer in title would not, however, be

---

[10]Respondent in his notice of deficiency determined that there was not a bona fide sale of the entire block of 232,429 shares transferred under the second agreement. Accordingly, he attributed the resale by Mr. Bowen to MacMillan of 187,500 shares to the initial seller, Mrs. Bowen. We are at a loss with respect to respondent's treatment of the 44,929 shares that were not resold by Mr. Bowen.

disregarded simply because Mr. Bowen paid no consideration for the stock. If the Bowens had been seeking to minimize their taxes, they would have attempted to maximize the basis of the stock in Mr. Bowen's hands. A purchase by him at less than fair market value would not have furthered a tax-avoidance purpose and, therefore, in this particular context, does not support respondent's contention that the sale was a "sham."

Respondent uses the terms "arm's length" and "bona fide" interchangeably. We have found that the sale *was* bona fide, in the sense that it was not a "sham"; whether it was arm's length has less bearing on whether it was a sale in this particular context.[11] A sale for less than fair market value is still a sale. It may be a bargain sale, in which case, the difference between fair market value may constitute, among others, compensation, a gift, or a dividend, depending on the circumstances, but it is nonetheless a sale to some extent. The basic point is that ownership changes hands.

Here, we are not convinced that the interspousal sale was for less than fair market value, but even if we were, the result would not change. We have held that the sale was valid for tax purposes. Respondent concedes, in such case, that Mr. Bowen correctly used his cost basis to compute his gain on the sale to MacMillan. Respondent has not asserted a gift tax deficiency, and, therefore, we need not decide whether the transaction was a part-sale, part-gift. The outcome of such an inquiry would not alter Mr. Bowen's basis in his stock under section 1.1015–4(a)(1), Income Tax Regs., which takes the greater of the amount paid by the transferee of the property or the transferor's adjusted basis.[12]

We hold that the Bowens' interspousal stock sale had sufficient substance to warrant respect for its form. Accordingly, Mr. Bowen correctly calculated his basis in the stock for purposes of gain recognition. Since we hold that petitioners

---

[11]The fact that the purported sale is made for less than fair market value may be indicative of a sham transaction where the reduction in purchase price furthers the tax-avoidance purpose. See, e.g., *Grodt & McKay Realty v. Commissioner*, 77 T.C. 1221 (1981).

[12]Mr. Bowen *might* receive a higher basis if gift tax is asserted since his basis is increased by the amount authorized by sec. 1015(d) for gift tax paid. See sec. 1.1015–5, Income Tax Regs. However, we do not have the facts before us to determine whether Mrs. Bowen is liable for gift taxes on the stock transfer. Since respondent has not asserted such liability, we need not address it.

properly reported the two sales of stock in controversy herein, it follows that they are not liable for the addition to tax for negligence or intentional disregard of rules or regulations.

To reflect the foregoing,

*Decision will be entered for the petitioners.*