PHILIP W. WRENN AND DOROTHY W. WRENN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7218–75.   Filed December 23, 1976.

*Roy D. Lambert,* for the petitioners.
*Leo A. Reinikka, Jr.,* for the respondent.

OPINION

DAWSON, *Chief Judge:* Respondent determined a deficiency of $56,387 in petitioners' Federal income tax for calendar

year 1973. The sole issue presented for decision is whether gain realized by petitioner Philip W. Wrenn from the sale of common stocks to his wife may be reported in annual installments pursuant to the provisions of section 453, I.R.C. 1954.[1]

This case was submitted for decision without trial in accordance with the provisions of Rule 122, Tax Court Rules of Practice and Procedure. We adopt the stipulation of facts and exhibits attached thereto as our findings. All pertinent facts are set forth below.

Petitioners Philip W. Wrenn and Dorothy W. Wrenn are husband and wife whose legal residence was Wilsonville, Ore., at the time they filed their petition herein. They previously had filed a joint Federal income tax return for calendar year 1973 with the Internal Revenue Service Center at Ogden, Utah. The Federal income tax liability reported on that return was computed by use of the cash receipts and disbursements method of accounting.

Dorothy W. Wrenn is a successful businesswoman who is cited in Who's Who In America. She has authored two books which have been published by major publishing houses and served as director of the Editorial Bureau of the Metropolitan Life Insurance Co. Prior to her marriage to Philip W. Wrenn in 1970, she held the positions of editor-in-chief of Parent's Magazine and vice president of Parent's Magazine Enterprises.

During January 1973 each petitioner independently owned a significant amount of property and had a substantial personal net worth. Dorothy Wrenn's net worth lay in the range of $225,000 to $260,000, while Philip Wrenn's net worth exceeded $260,000.

Philip Wrenn owned shares of stock in a variety of publicly held corporations prior to January 21, 1973. On that date he sold all of his right, title, and interest in and to certain designated securities to Mrs. Wrenn under a contract labeled "Installment Sales Contract." The securities tendered were the separate property of Mr. Wrenn prior to that transfer, and became Mrs. Wrenn's separate property once the sale was effected. Under the terms of the installment sales contract,

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Mrs. Wrenn agreed to pay $250,000 for the securities, plus interest at 5 percent, in monthly payments of $1,926.98[2] for a period of 15 years beginning on April 1, 1973, to evidence her obligation by issuing Mr. Wrenn a promissory note, and to provide him with security for the payment of the agreed price by purchasing $250,000 in shares of the Fidelity Trend Fund. Each monthly payment represented amortized amounts of principal and interest. Mrs. Wrenn evidenced her obligation by means of a promissory "Installment Note" which she gave Mr. Wrenn on the date of transfer. Once the contract of sale was executed, the securities sold thereby were subject to disposition solely at the will or whim of their new owner, Dorothy W. Wrenn. Mrs. Wrenn was under no obligation, contractual or otherwise, to dispose of such securities other than at her pleasure.

All of the securities purchased by Mrs. Wrenn from her husband on January 21, 1973, subsequently were sold by her on the open market during that same day for $250,874. Mrs. Wrenn had made numerous investments of her separate property in mutual funds prior to the instant transaction. As agreed in the sales contract, Mrs. Wrenn proceeded to purchase shares in the Fidelity Trend Fund worth $250,000 after the purchase of common stocks from her husband had been completed.

Petitioners reported portions of the installment payments received by Philip Wrenn during the calendar year 1973 as long-term capital gains on Schedule D of that year's return. Respondent subsequently rejected petitioners' use of the installment method on the ground that the purported installment sale lacked substance and could not be recognized for tax purposes. Citing Mrs. Wrenn's immediate resale of the shares purchased from her husband, respondent determined that no "business purpose" had been established for the transaction, that a "sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title," and that "the install-

---

[2] The parties stipulated that the monthly payments were $1,926.98, and discussed that figure in their respective briefs. We note that both the "Installment Sales Contract" and "Installment Note" involved in the transfer of stock between the spouses used $1,976.98 as the monthly installment figure. This discrepancy is not material to our examination of the issue presented.

ment method may not be used to report the gain from a sale to a related taxpayer who pursuant to a prearranged plan resells the property to a third party and receives full payment in the year of sale."

The parties agree that the note and installment contract are valid and enforceable under Oregon law. Petitioners defend their installment sale election by asserting that the instant transfer was bona fide in nature and not so structured solely for purposes of tax avoidance. They argue that a bona fide section 453 installment sale does not need to be premised upon a business exigency and, in any event, that Philip Wrenn had a business purpose for effecting this transfer because he thereby increased his current return on investment from approximately 3 percent (from dividends) to 5 percent (from Mrs. Wrenn's interest). It is contended further that Mrs. Wrenn's unrestricted power to hold or sell the shares purchased from her husband solely at her will or whim negated any alleged prearrangement or agency relationship. Petitioners buttress this point by asserting that although as husband and wife they form a household unit, the mere fact of a marriage relationship in no way connotes an agency relationship. Moreover, they underscore the fact that they are two distinct taxpayers despite the proper filing of a joint Federal income tax return.

Respondent defends his disallowance of section 453 treatment by arguing that, despite the petitioners' compliance with all statutory prerequisites, the substance of this purported installment sale is different from its form. Although legal title to the securities was passed between the Wrenns, respondent seeks to telescope the various steps undertaken by them into one sale attributable to Philip Wrenn alone for tax purposes. In support of this position respondent stresses the close intrafamily relationship between buyer and seller, the immediate resale of the stocks by Mrs. Wrenn, the alleged absence of any substantial business purpose for Mr. Wrenn's election to use this form of sale, Mrs. Wrenn's immediate purchase of mutual fund shares as per the contract with the proceeds from her sale of common stocks, and the fact that after all steps were completed the family unit retained the entire sale receipts while reporting the gain in installments on a joint return. Respondent concludes that Mrs. Wrenn

acted merely as her husband's agent by selling these stocks to a third party pursuant to a prearranged plan.

We must determine whether the facts presented warrant an imposition of the judicially created "substance over form" doctrine to bar petitioners from claiming the section 453 installment sales treatment. As a relief measure, section 453 is to be narrowly construed. *Cappel House Furnishing Co. v. United States*, 244 F.2d 525, 529 (6th Cir. 1957). Taxpayers previously have been denied its benefits whenever the transfer in question was not found to have been a true installment sale. See, e.g., *Griffiths v. Commissioner*, 308 U.S. 355 (1939); *Hindes v. United States*, 326 F.2d 150 (5th Cir. 1964); *Williams v. United States*, 219 F.2d 523 (5th Cir. 1955); *Everett Pozzi*, 49 T.C. 119 (1967). Embodied within section 453 is a congressional desire to permit the spreading of the tax on a gain over the period during which payments of the sales price are made so that the seller can pay the tax out of his receipts rather than being forced to advance the tax collector his due prior to actual receipt. *Everett Pozzi, supra* at 126. Only one court has previously addressed the availability of installment sales treatment to either party to an interspousal transfer. Therefore, we will examine its decision in detail.

The United States District Court for the Middle District of North Carolina upheld installment sales treatment for an interspousal transfer of common stocks in *Nye v. United States*, 75–1 USTC par. 9510 (M.D.N.C. 1975). Charles and Mary Nye were husband and wife who filed joint Federal income tax returns for the taxable years in issue. Charles, an attorney, and Mary, a physician, each had developed a successful professional business prior to the transfer in question. The Nyes maintained separate checking accounts for the proceeds derived from the practice of their respective professions and from their individual investments. A joint account was maintained for living expenses.

Mary Nye invested a substantial sum of money in the stock of Colorcraft Corp. in 1964 upon the advice of her husband. That stock was purchased with money drawn from her individual checking account, and, during the intervening years, was listed as her separate property on her North Carolina intangible tax returns. Early in 1969 Mrs. Nye decided to sell some or all of that stock. She then held Fuqua

Industries convertible preferred shares as a result of a merger between Colorcraft and Fuqua. Charles Nye needed approximately $100,000 at about that time to satisfy contractual obligations he alone had to third parties arising out of a construction financing venture. Although he had ample personal resources with which those obligations could have been satisfied, Mr. Nye convinced his wife to sell him a portion of her Fuqua shares under an installment sales agreement so that he could resell the shares on the open market to obtain the funds needed to meet his contractual obligations. The Nyes then entered into an agreement whereby Mrs. Nye transferred ownership of a portion of her shares to her husband in exchange for a cash downpayment and his promissory note requiring payment of the residual balance in installments over an 11-year period plus 4-percent annual interest. The agreed-upon price approximated the stock's fair market value. Less than 5 months later Charles Nye converted the preferred shares into common shares, sold most of them on the open market, and applied the proceeds of sale against his contractual obligations. Using the same analysis that he advances herein, the respondent disallowed the Nyes' claimed section 453 treatment on the ground that Mr. Nye acted merely as his wife's agent in disposing of those shares.

The District Court turned to *Rushing v. Commissioner*, 441 F.2d 593, 598 (5th Cir. 1971), affg. 52 T.C. 888 (1969), for guidance and found therein a statement of principles relating to contested installment sales:

a taxpayer may, if he chooses, reap the tax advantages of the installment sales provision if he actually carries through an installment sale, even though this method was used at his insistence and was designed for the purpose of minimizing his tax. * * * On the other hand, a taxpayer certainly may not receive the benefits of the installment sales provisions if, through his machinations, he achieves in reality the same result as if he had immediately collected the full sales price, or, in our case, the full liquidation proceeds. As we understand the test, in order to receive the installment sale benefits the seller may not directly or indirectly have control over the proceeds or possess the economic benefit therefrom. [Citations omitted.]

Finding that the underlying purpose for structuring that transfer as an installment sale was to reduce Mrs. Nye's tax on her total capital gain as well as make funds available to

Mr. Nye at 4-percent interest, the court upheld the taxpayers' use of the installment sales method for reporting gain. Because the Nyes were found to be two independent economic entities with two separate and distinct purposes for entering into such an agreement, the court observed that it was "evident that the sole reason the I.R.S. has denied Mary Jane Nye the benefit of the installment method of reporting her gain is because of the marriage relationship existing between her and the purported installment purchaser." 75–1 USTC at p. 87,367. The court proceeded to declare that although such a relationship "obviously" rendered the transaction suspect, the mere existence of a marriage relationship was not determinative of either the existence of an agency relationship between spouses or posttransfer control over property sold by one spouse to the other. Noting that the facts in *Nye* were "rather uncommon," it stated at page 87,368:

> Good reason exists for the I.R.S. to be suspicious of tax saving transactions between spouses, but here nothing was done between Dr. and Mr. Nye which could not have been legitimately done between Mary Jane Nye and any stranger. The simple fact of their marriage relationship, standing alone without anything more to support an adverse inference, is insufficient to deprive Mary Jane Nye of the benefits of section 453(b). [Fn. refs. omitted.]

Although we agree with that analysis of the law pertaining to interspousal installment sales, we must determine whether these petitioners have demonstrated that they qualify for the benefits of section 453 when measured by this standard.

Interspousal installment sales are subject to close judicial scrutiny because of their inherent potential for unwarranted tax avoidance in transfers that cannot be deemed bona fide in view of the relationship between two parties. As noted in *Nye*, bona fide transfers of this nature are to be accorded section 453 relief, but, in order to be deemed bona fide both the buyer and seller must demonstrate their independence of action. Petitioners bear the burden of proof in such cases. Rule 142, Tax Court Rules of Practice and Procedure.

After a careful review of the stipulated facts and arguments adduced by the parties, we conclude that petitioners are not entitled to report any gain realized from the instant transfer in installments pursuant to section 453 of the Code because we are not convinced that the purported installment sale was bona fide in nature. Despite the similarity between the facts

herein and those established in *Nye,* we find several distinguishing features which place petitioners outside the carefully drawn guidelines described in that case. Foremost among these discrepancies is the apparent absence of any independent purpose underlying Mrs. Wrenn's purchase of the specified securities from her husband. Our concern is not focused upon the lack of a "business purpose," but upon the lack of any apparent substantive purpose. A valid business purpose undoubtedly would suffice, but more personal motivations could indicate a bona fide transaction as well.

Mrs. Wrenn obviously did not purchase the common shares from her husband for their intrinsic value because she proceeded to sell them immediately after receiving title to them. Nor did she regard them as a means of obtaining needed funds at a low rate of interest, a situation held to evidence a bona fide purpose in *Nye,* because petitioners have not advanced any particular requirement for funds on her part. While the record indicates that she may have used the sales proceeds to purchase mutual fund shares, it also indicates that she only purchased those shares to satisfy the security requirement in her contract of purchase with Mr. Wrenn and not for any particular reason associated with their intrinsic value. Indeed, a review of the supporting schedules petitioners filed with their 1973 income tax return reveals that Mrs. Wrenn engaged in a regular program of monthly sales of mutual fund shares after April 1, 1973, which was carefully structured to generate just enough cash to enable her to meet her required monthly principal and interest payments. Even if we were to ignore the aforementioned security requirement, this course of action in conjunction with her substantial net worth would effectively negate any implication that Mrs. Wrenn desired to own the mutual fund shares for any particular personal or business reason. We acknowledge that business and investment climates may change drastically in a very short period of time and that original intentions may change accordingly. Petitioners have not presented any evidence on this point, however, so we must assume that both business conditions and Mrs. Wrenn's purpose remained constant throughout this period. Thus, having found that neither the common shares nor the mutual fund shares were held by Mrs. Wrenn for any reason not

associated with her contractual obligation to provide Mr. Wrenn with security, we conclude that she had no bona fide reason for entering into the instant transaction other than to assist her husband in his scheme of tax avoidance. The intervening period between purchase and resale is only one factor among others that must be considered. It is the absence of other evidence that thrusts this one factor into prominence in this case.

Similarly, we are not persuaded that Mr. Wrenn had any bona fide purpose for entering into the instant arrangement other than tax avoidance. Petitioners' argument concerning Mr. Wrenn's improvement of his current return on investment from 3 percent to 5 percent is not persuasive. Not only are brokerage commissions substantial enough to eliminate a large portion of any gain here, but we find in addition that this purported purpose is insufficient alone to establish the Wrenns' interspousal transfer as a bona fide installment sale. Our conclusion does not hinge upon the correctness of any business decision underlying a purported purpose or the degree of rationality upon which a nonbusiness purpose rests; we are merely unable to perceive in this record a significant purpose other than tax avoidance on the part of either spouse.

Confronted as we are with unanswered questions pertaining to the individual petitioner's subjective intentions, we are constrained to sustain respondent's determination that petitioners are not entitled to installment sales treatment on the instant transfer. Cases of this type must be decided on all of the facts and circumstances presented. Petitioners must establish as a positive fact that the transfer in question was undertaken primarily for a bona fide purpose other than tax avoidance. The objective facts known here are quite susceptible to inferences adverse to petitioners' position. Although a marriage relationship alone is not a sufficient ground for denying section 453 relief, the suspicions which it arouses conjoin with the immediate resale of common shares, apparent prearrangement of sale, and absence of purpose other than tax avoidance here to impose a difficult burden upon petitioners. In light of their failure to carry that burden we must sustain respondent's determination.

It is possible that a household unit can receive the benefits of section 453 and also receive the full proceeds of sale in a

single taxable year as long as the transfer between the spouses is found to have substance. There is no question that both spouses filing a joint return are individual taxpayers. *Marie A. Dolan,* 44 T.C. 420 (1965). If each spouse is willing to accept the risks of entering into a bona fide, legally recognizable installment sale with the other, we will acknowledge their right to claim the benefits of section 453 despite their ability to file a joint return.

To reflect the conclusion reached herein,

*Decision will be entered for the respondent.*