LORRAINE T. FINK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fink v. Commissioner
Docket No. 4042-80.
United States Tax Court
T.C. Memo 1982-284; 1982 Tax Ct. Memo LEXIS 458; 43 T.C.M. (CCH) 1452; T.C.M. (RIA) 82284; May 24, 1982. F. Patrick Matthews, for the petitioner. Mark D. Petersen, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge:* Respondent determined deficiencies in petitioner's Federal income tax for the calendar years 1973 and 1974 in the respective amounts of $ 200,062.11 and $ 274.22. After various concessions *459 made by the parties prior to trial, as well as upon brief, only one issue remains for the Court to decide: Whether, under the facts of this case, an installment sale of certain securities by petitioner to her son in 1973 should be disregarded for Federal income tax purposes, and should be treated instead as an all cash sale by petitioner of such securities to another party in 1973, thereby depriving petitioner of the right to employ the installment sale method of reporting her gains on the transaction. The evidence in the case consists of a stipulation of facts with numerous attached joint exhibits, together with testimony of witnesses and certain other exhibits received at trial. FINDINGS OF FACT Petitioner Lorraine T. Fink was a resident of North Port Charlotte, Florida, at the time the petition herein was filed. Her Federal income tax returns for 1973 and 1974 were timely filed with the Internal Revenue Service Center at Chamblee, Georgia. E-Z Paintr Corporation *460 (hereinafter referred to as "Paintr") was a Delaware corporation founded by petitioner's then husband and his brothers in about the year 1945. Its principal place of business was Milwaukee, Wisconsin, and its principal business was the making of paint rollers and closely related products. Prior to 1971, Paintr was controlled and operated by petitioner and various other members of her family including petitioner's children, one of whom was John Touchett (hereinafter "Touchett"). In 1971, because of Paintr's financial difficulties and some fundamental disagreements within management, petitioner's family lost control of Paintr to Herbert L. Stern, Jr. (hereinafter "Stern"), who was petitioner's family lawyer and one of the venture capitalists in Paintr, and Paintr shareholders friendly with Stern. At that time, most of petitioner's family members who were connected with Paintr were forced out of the company as active participants, including Touchett, who had been an employee of Paintr. Subsequent to his ouster from Paintr by the Stern group in 1971, Tochett undertook to formulate a plan by which control of Paintr could be regained. To this end, he contracted other family and *461 nonfamily shareholders of Paintr who were friendly to his cause, and Touchett and this group then opened negotiations with the president of Newell Companies, Inc. (hereinafter "Newell"), with the idea of bringing about a merger of Paintr with Newell. Such a plan was proposed, but was vigorously resisted by the Stern group then controlling Paintr, so that the original merger idea had to be abandoned. Both Newell and Paintr were publicly traded companies, although Newell was the larger company in terms of gross sales. At all times material hereto there were 1,008,424 shares of Paintr stock issued and outstanding. The Touchett group's first attempt at achieving a merger between Paintr and Newell having failed, it was determined that the only way the Touchett group could regain control was by by acquisition of more than 50% of the outstanding Paintr shares, and Newell was enlisted in this effort as the vehicle through which control could be obtained. At that time, the Touchett group, including petitioner and certain other friendly shareholders, had control of approximately 40% of the Paintr outstanding stock. In order to obtain control of Paintr, it was therefore necessary for *462 the Touchett group, including Newell, to acquire an additional 12 to 15% of the Paintr stock so that this group would control more than 51% of the outstanding Paintr stock. In furtherance of this program, Newell, during the fall of 1972, began to acquire control of the approximately 40% of the Paintr stock held by Touchett family members, including the petitioner, and other friendly minority shareholders. This was done by means of various option agreements between Newell and the Touchett group of shareholders. As part of this procedure, petitioner, by agreement dated November 21, 1972, granted Newell an option on all of her Paintr shars, in exchange for Newell's immediate purchase of 2,000 of those shares. By use of such options, Newell, by December 5, 1972, had acquired outright ownership of 24,645 shares of Paintr stock and the right or option to acquire 256,974 additional shares. Prior to entering into such option agreement with Newell, petitioner had pledged 10,754 shares of her Paintr stock to the Marshall and Ilsley Bank of Milwaukee, Wisconsin ("M & I Bank") as security for Loans said bank had made to her, totalling $ 51,000. Likewise, prior to said option agreement with *463 Newell of November 21, 1972, petitioner had pledged 40,009 shares of her Paintr stock to the Merchants and Savings Bank of Janesville, Wisconsin ("M & S Bank") as collateral for loans made by that bank to or for Touchett, or with respect to loans which were guaranteed by Touchett. Prior to November 21, 1972, petitioner owned a total of 53,772 shares of Paintr stock. In addition to immediately purchasing 2,000 shares of Paintr stock from petitioner, the agreement entered into between Newell and petitioner on November 21, 1972, gave Newell the right to acquire all (but not less than all) of petitioner's remaining shares at a price of $ 15.00 per share. Newell was obligated to exercise said option only if it had acquired ownership or control over 51% of the outstanding Paintr stock prior to May 21, 1973. On December 5, 1972, Newell filed a proposed public tender offer for 250,000 shares of Paintr stock. Shortly thereafter, under date of December 29, 1972, Newell and petitioner amended their previously executed option agreement. One of said amendments provided that if more than 250,000 shares of Paintr were tendered to Newell during the first 10 days of the public tender offer, Newell *464 had the right to purchase less than all of such shares tendered in excess of 250,000; and that if Newell should elect to purchase less than the total amount of shares offered, it would be required under applicable Wisconsin state securities laws to apportion its purchases among the various persons tendering such shares; and that therefore petitioner's option agreement should be amended so as to provide that petitioner's optioned shares should likewise be subject to the same proration, so that Newell might not be required to acquire the full amount of petitioner's shares upon achieving 51% control of Paintr, as had been previously agreed. Any such shares not acquired by Newell were to be released from the option agreement. The option agreement between Newell and petitioner, as amended, was silent on the question whether such option agreement would survive a merger of Paintr into Newell. As the result of Newell's public tender offer for Paintr stock, Paintr, then controlled by the Stern group, brought action in the Federal District Court in Milwaukee, Wisconsin, seeking to block said tender offer and alleging various violations of Federal law, including section 7 of the Clayton Act, *465 and various violations of the Securities Exchange Act of 1934. Newell filed a counterclaim to the Paintr action seeking damages and an injunction against Paintr, and alleging violations by Paintr of the Securities and Exchange Act of 1934, and violations of the Wisconsin Uniform Securities Law and the Wisconsin Corporate Takeover Law. After proceedings before the Wisconsin Securities Commission, however, Newell was allowed to make its tender offer to the Paintr shareholders on February 8, 1973. Said tender offer was for a price of $ 15.00 per share. In combating this move, the Stern group (then in control of Paintr) actively pursued the acquisition of Paintr shares at a price in excess of Newell's tender offer. Despite these attempts by the Stern group, however, by March 21, 1973, Newell had purchased and owned outright 447,018 shares of Paintr stock, excluding any of the shares owned by members of petitioner's family and excluding petitioner's shares which were under option to Newell. Two days later, on March 23, 1973, Newell, together with certain other friendly Paintr shareholders, being in control of a majority of the outstanding Paintr shares, caused Painter's by-laws *466 to be amended so as to reduce the size of the Board of Directors to three members, and also accomplished the removal of certain officers and directors of Paintr, being members of the Stern group theretofore in control. This takeover having unsuccessfully been contested by the Stern group in the pending Federal Court cases, Stern, who had been removed as an officer and director of Paintr, intervened in the pending Federal antitrust action as a plaintiff in a derivative suit on behalf of Paintr, and also appealed to the United States Court of Appeals for the Seventh Circuit with respect to his unsuccessful effort to block the Newell takeover of Paintr. The ouster of the Stern group from control of Paintr also caused a flood of shares to be tendered to Newell under its outstanding tender offer, so that the tender offer was immediately substantially oversubscribed. Just prior to these events, on March 14, 1973, Newell and eptitioner entered into a further amendment of the outstanding option agreement between them, so as to provide that Newell would purchase an additional 3,000 shares of petitioner's Paintr stock upon tender by petitioner, and that the period within which Newell *467 could exercise its option as to petitioner's remaining stock was extended until 20 days following the next annual meeting of Paintr or to January 15, 1974, whichever should occur first. Petitiner transferred and received payment from Newell for said 3,000 shares on the same day, in the amount of $ 45,000.00. Negotiations to settle the pending suits between Newell, Paintr and other intervenors were commenced in June, 1973, and finally culminated in July of 1974 with a stipulation of the parties to dismiss all claims and actions by one against the other upon a merger of Newell and Paintr to be accomplished by the exchange of.78 shares of Newell stock for each share of Paintr stock. Such stipulation of dismissal was subject to approval by the Federal District Court in September, 1974. In the meantime, and before the outcome of the Federal Court litigation between Newell and Paintr was known, Touchett in 1973 found himself in financial difficulties. He was liable for $ 714,700 for loans made either directly to him or guaranteed by him from the M & S Bank (not including accrued interest). Said loans were secured, in large part, by Paintr stock belonging to petitioner which she *468 had allowed to be pledged as collateral for her son's loans and guarantees at the M & S Bank. As of August 1, 1973, there were 33,509 of petitioner's Paintr shares so pledged at the M & S Bank on account of Touchett's debts and guarantees, as well as 2,500 shares belonging to Touchett. In addition, Touchett had mortgage loans from the M & S Bank in excess of $ 200,000. Touchett was also indebteded to the M & I Bank for loans in the amount of $ 97,000. In the summer of 1973, the M & S Bank had been criticized by the banking authorities, who considered that Touchett's loans with the bank were of unacceptable quality. The bank, in turn, began to press Touchett for payment or substantial reduction of his outstanding loans. The M & I Bank was also pressing Touchett for repayment to his outstanding loans. Under the terms of the collateral agreements covering the Paintr stock of petitioner and Touchett which had been posted as collateral with the M & S Bank for Touchett's loans and guarantees, the bank was entitled to take and liquidate for the best price obtainable petitioner's collateralized shares at any time when the bank, within its sole, good faith discretion, considered itself *469 to be "insecure" with respect to the loans; and Touchett had been warned by an executive of the M & S Bank that if his loans were not paid within a reasonable time, the bank would liquidate the collateral which it held, consisting principally of petitioner's and Touchett's stock. Prior to the takeover of Paintr by the Newell and Touchett group on March 23, 1973, the stock of Paintr in 1973 had traded within a range of a high asking price of 16 1/4 to a low bid price of 11 5/8. Subsequent to the takeover, the price began to decline precipitously, on declining volume, and by the end of July, 1973, was trading in the range of 6 1/4 to 7 1/4. After September, 1973, the stock was untraded. The market price of Newell stock ranged from a high of 23 7/8 on January 9, 1973, to a low of 5 7/8 on December 3, 1973; on August 1, 1973, its market price was 11 5/8, and it steadily declined thereafter.
In the option agreement originally entered into between the petitioner and Newell, petitioner had warranted that her optioned shares were to be free and clear of any encumbrance and that she had the right and power to transfer such shares. This statement was untrue, since, at the time petitioner *470 entered into said option agreement on November 21, 1972, 50,754 out of her total of 53,772 shares were pledged either to the M & S Bank or to the M & I Bank for her loans or for Touchett's obligations. During 1973, Newell was not aware that any of petitioner's stock was pledged as collateral for loans. Under date of August 1, 1973, petitioner entered into an installment sale contract with Touchett, under which she sold Touchett her remaining 48,772 shares at a price of $ 15 per share. Of these shares, 33,509 were still under pledge to the M & S Bank, and 10,754 shares were still under pledge to the M & I Bank. Petitioner again warranted in this agreement that said shares were free of all encumbrances and liens, except as to the option agreement with Newell. On August 13, 1973, petitioner's 10,754 shares were released as collateral by the M & I Bank. On August 14, 1973, Touchett and his attorney went to Chicago to confer with Newell's attorneys, in an attempt to secure the immediate sale to Newell of the 48,772 shares which Touchett had bought from petitioner at the option price of $ 15 per share, as well as an additional 2,500 shares owned by Touchett and pledged with M & *471 S Bank. Touchett and his attorney took with them the certificates representing these shares of stock (the 33,509 shares and 2,500 shares still under pledge to M & S Bank, having temporarily been released to the custody of Touchett's attorney for this purpose). Newell declined at the time to exercise its option and pay all cash; it did agree, however, as memorialized in an agreement dated August 27, 1973, that its option with respect to the 48,772 shares, as well as the additional 2,500 shars owned by Touchett, would be considered as exercised as of August 14, 1973, with payment for the shares, at $ 15 per share, to be made prior to January 1, 1974. [1] This agreement further provided, for the first time, that Newell's option would extend to any shares of Newell which might to received by reason of an exchange of Paintr shares for Newell's shares in the prospective merger. The installment sale agreement between petitioner and Touchett provided that Touchett should pay petitioner $ 100,000 upon execution of the *472 agreement, but this amount was not paid. Petitioner's shares were not reregistered in Touchett's name, but petitioner delivered to Touchett executed blank stock powers enabling Touchett to make the transfer of the shares. Touchett did make a payment to petitioner on account of this installment sale obligation in the amount of $ 50,000 in 1974, which she used to pay off her $ 51,000 loan at the M & I Bank. On December 26, 1973, Newell carried out the agreement which it had made with Touchett with regard to the 48,772 shares, paying Touchett by check in the full amount of $ 731,580. These proceeds were used to liquidate Touchett's obligations at the M & S Bank, with the exception of $ 50,000. None of the proceeds of sale were subject to petitioner's direction or control, and no trust or escrow fund was established for petitioner's benefit to assure her receipt of the proceeds of Touchett's sale of Newell. At the time Touchett negotiated the agreement with Newell evidenced by the agreement of August 27, 1973, covering, inter alia, the sale of the 48,772 shares, Touchett was the owner of said shares, as the result of his purchase from petitioner on August 1, 1973. Petitioner *473 exercised no control over Touchett in his negotiations with Newell, [2] and Touchett was not acting as petitioner's agent or nominee in selling said shares of Paintr to Newell.Petitioner received none of the sale proceeds, directly or indirectly, in 1973. Petitioner reported the sale of her 48,772 shares in her Federal income tax return for 1973, showing no gain reportable in the year, and elected to report said sale on the installment basis. She reported the $ 50,000 received from Touchett in her 1974 income tax return as an installment payment on her sale to Touchett. She reported the unpaid balance of her sale to Touchett in her Florida intangible Personal Property Tax Returns for 1973 and 1974. Upon audit of petitioner's 1973 return, respondent determined that petitioner, rather than Touchett, had sold the 48,772 shares of Paintr stock in 1973 to Newell. Since all sales proceeds covering these shares were paid by Newell in 1973, respondent determined that petitioner had actually or constructively received payment and was taxable on the entire gain in that year. *474 Petitioner's installment sale to Touchett on August 1, 1973, was not a sham transaction, was entered into for valid business and personal reasons aside from tax considerations, and had economic reality. The income tax results to petitioner, although considered by petitioner and Touchett at the time, were not the only, nor the major motivating factor in the sale. OPINION This case involves still another application of the now-well-known "substance-over-form" doctrine in the tax law. Simply stated, the question is whether the form in which a transaction is cast should be determinative of its tax results; or whether, on the other hand, the formalities in which the transaction was clothed should be ignored, and tax treatment should be accorded pursuant to the actual economic substance of the transaction. Petitioner contends that in the year 1973 she made a perfectly valid installment sale of certain shares of stock owned by herself in Paintr to her son, John Touchett; that she received less than 30% of the sales proceeds in the year of sale, as mandated by section 453(b) of the Internal Revenue Code; [3] and that she is therefore entitled to report such *475 sale on the installment basis, as sale proceeds are received by her. Respondent, on the other hand, determined that the sale by petitioner to her son of such stock was a purely artificial or sham transaction; that petitioner's son, John Touchett, was acting merely as petitioner's nominee or agent in effecting the sale of said shares to the Newell Companies; and that therefore petitioner's sale to Touchett on August 1, 1973, should be disregarded for tax purposes, and that petitioner should be regarded as having made the sale of her shares directly to the Newell Companies. Since Newell paid all cash for such shares in the year 1973, respondent accordingly determined that all such proceeds were reportable by petitioner in that year, and that the installment basis of reporting under section 453 was not available to her. As it existed in the year 1973, the pertinent sections of section 453 provided as follows: (b) Sales of Realty and Casual Sales of Personalty.- (1) General Rule.-Income from - (A) a sale or other disposition *476 of real property, or (B) a casual sale or other casual disposition of personal property * * * for a price exceeding $ 1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation.- Paragraph (1) shall apply - (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition - (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price. That the substance-over-form doctrine is an important factor in the administration of the income tax laws is not to be doubted. As the Supreme Court said in Commissioner v. Court Holding Company,324 U.S. 331, 334 (1945): The incidence of taxation depends upon the substance of the transaction.The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, *477 the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transferred for tax purposes into a sale by another by using the later as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.[Fn. ref. omitted] Further expanding and refining this doctrine, the Supreme Court said in the later case of United States v. Cumberland Public Service Co.,338 U.S. 451 (1950): What we said in the Court Holding Company case was an approval of the Tax Court in looking beyond the papers executed * * *. We were but emphasizing the established principle that in resolving such questions as who made a sale, fact-finding tribunals in tax cases can consider motives, intent, and conduct in addition to what appears in written instruments used by the parties to control rights as among themselves. [Citations omitted] 338 U.S. 451, 454 n. 3. It is for the trial *478 court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs. 338 U.S. 451, 456. Before proceeding to a consideration of later relevant cases which have interpreted and applied this doctrine, a preliminary but important point must be noted: the fact that one of the motives underlying the questioned transaction was a desire to save taxes, even though such motive was a major motive, will not prevent the transaction from being recognized for tax purposes. The Supreme Court gave specific recognition to this proposition in United States v. Cumberland Public Service Co.,supra, as did the Court in Commissioner v. Court Holding Co.,supra, in citing and relying upon its earlier case of Gregory v. Helvering,293 U.S. 465 (1935) where it was said: The legal right of the taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted * * *. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. *479 [Citations omitted] 293 U.S. 465, 469. Thus, the question is not whether a tax saving motive was present in structuring the transaction in question, or even whether such tax motive may have been a highly important reason for doing so; rather, the question is whether the transaction had any business reasons or economic reality aside from the tax motives -- in other words, whether what purported to happen really did happen, or whether it was a purely ephemeral shuffling of papers, having no substance or reality beyond a desire to avoid taxes. With these concepts in mind, and remembering that each case must be considered upon its own facts, and in light of all the relevant surrounding circumstances, it may be appropriate to consider how the courts have applied the substance-over-form doctrine in comparable cases. In the context of the factual situation presented here, the most instructive case is Rushing v. Commissioner,52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971). In that case, the taxpayers, owning all the stock of two corporations, caused such corporations to be put into liquidation under the provisions of section *480 337. During the 12-month period within which such corporations were required to liquidate and distribute all their assets, taxpayers created trusts for their respective families and sold their stock in the two corporations to the trusts. The sales by taxpayers to the trusts were made on the installment basis, and taxpayers claimed the benefits of section 453 in reporting their gain on the sale. Shortly after such sale, the two corporations completed their process of liquidation and transferred all their assets and liabilities to the trustee of the taxpayers' trusts. The Commissioner took the position that the installment sale by taxpayers to the two trusts should be disregarded for tax purposes, and that it should be held that taxpayers, rather than the trusts, were to be treated as having constructively received the proceeds of liquidation in the year 1963, which was the year in issue.In holding for the taxpayers, and upholding the validity of the installment sale, this Court noted that taxpayers had no control over the trustee of the trusts to whom they had sold the shares, and further noted that there was no element of taxpayers attempting to shift their tax liability to someone *481 else; rather, the only question was as to the timing of the recognition of gain by the taxpayers. In affirming our decision, the Court of Appeals for the Fifth Circuit ( Rushing v. Commissioner,441 F.2d 593 (5th Cir. 1971)) used language which is significant in the context of the instant case: At the outset we feel compelled to state what this case is not about. In the first place, there is no attempt to change the character of the gain involved and convert what would be ordinary income into capital gain. The gain realized by the taxpayers on the liquidation of the corporations, whether derived through sale of the installment basis to the trust or directly from the liquidation proceeds, would be entitled to capital gains treatment. Secondly, this is not a case where one taxpayer has attempted to shift the gain to a second taxable entity in order to reap the benefits of the second entity's tax rate. The price the trust paid the taxpayers for the stock was the full value of the stock, including the appreciation in value which would be realized upon liquidation. * * * The taxpayers, in effect, kept all of the gain realized as a result of the appreciation in *482 value of the stock. The only question is whether they must pay taxes on the entire amount of the gain in the year the corporations were liquidated or whether they may pay taxes on the entire amount over a period of years as the installment payments are received from the trusts. * * * This is not the first time that a taxpayer in order to receive installment sale benefits, has created a third entity between himself and the ultimate source of his profit. * * * We think it clear from a reading of those cases that a taxpayer, may, if he chooses, reap the tax advantages of the installment sales provision if he actually carries through an installment sale, even though this method was used at his insistence and was designed for the purpose of minimizing his tax. * * * On the other hand, a taxpayer certainly may not receive the benefits of the installment sales provisions if, through his machinations, he achieves in reality the same result as if he had immediately collected the full sales price, or, in our case, the full liquidation proceeds. As we understand the test, in order to receive the installment sale benefits the seller may not directly or indirectly have control over the proceeds *483 or possess the economic benefit therefrom. * * * Applying these principles to the instant case, we find that the taxpayers here are entitled to the benefits of the installment sale provision. * * * An autonomous entity controlled the proceeds, and no right of recapture inured to the benefit of the taxpayers. The Tax Court found, and we think the evidence supports the finding, that the trustee was independent of the taxpayers' control. * * * The taxpayers retained no effective benefit or control over the liquidation dividend. Absent the possibility of control or recapture, the alienation of the stock cannot be hyphenated for tax purposes by merely labeling the transaction an assignment of income or constructive receipt. Here there was no possibility of recapture or control. The trustee was no alter ego of the taxpayers; it had independent duties and responsibilities to persons other than the taxpayers. The taxpayers' only effective means of obtaining the benefit of the liquidation proceeds was under the contract of sale with the trust a contract which provided for payments to be made on the installment basis. The taxpayers therefore are entitled to report their gain as it *484 is received by them. (footnote references and citations omitted) 441 F.2d 503 at 597-598. The Rushing case thus enunciated two standards or tests to be applied to determine the validity of installment sale contracts of the type presented in the instant case: (a) that the seller have no effective control over the buyer, and that (b) the seller have no effective control over or right to receive the proceeds of a later sale by the buyer. The Rushing case has been followed by the courts in later cases where similar factual situations were presented. In these cases, where it was shown that the seller had no effective control over the buyer, and further had no right to control the disposition of the proceeds of a later sale by the buyer, either through direct control or through some security interest such as the establishment of a trust or escrow account for taxpayer's benefit, the courts have consistently followed the doctrine of Rushing. See Pityo v. Commissioner,70 T.C. 225 (1978); Roberts v. Commissioner,71 T.C. 311 (1978); Weaver v. Commissioner,71 T.C. 443 (1978); Wilson v. Commissioner,T.C. Memo. 1980-288. *485 The principles of Rushing were also accepted and applied in Nye v. United States,407 F.Supp. 1345 (M.D.N.C. 1975). On the other hand, in cases where it was shown that the sellers under the installment sale contract either had an effective control over the buyer, or had reserved to themselves significant rights with respect to the proceeds of the buyer's later sale, the courts have tended to find that the installment sale was a mere sham transaction, lacking economic reality, and have held that the installment sale was to be disregarded for income tax purposes.See Lustgarten v. Commissioner,71 T.C. 303 (1978), affd. 639 F.2d 1208 (5th Cir. 1981); Wrenn v. Commissioner,67 T.C. 576 (1976). Even though this Court decided the Wrenn case adversely to the taxpayers, however, it is significant to note that we said: Our concern is not focused upon the lack of a "business purpose", but the lack of any apparent substantive purpose. A valid business purpose undoubtedly would suffice, but more personal motivations could indicate a bona fide transaction as well. * * * Cases of this type must be decided on all of *486 the facts and circumstances presented. Petitioners must establish as a positive fact that the transfer in question was undertaken primarily for a bona fide purpose other than tax avoidance. 67 T.C. 576, 583, 584. Applying all these principles to the facts in the instant case, we conclude that petitioner has the better of the argument, and that the validity of her installment sale to her son in 1973 is entitled to recognition for tax purposes. Concededly, the record is not entirely one way in this case. It is true, as respondent has pointed out, that the stock which petitioner sold to her son was not reregistered in the son's name prior to his subsequent sale of that stock to Newell. It is also true that petitioner signed the August 27th agreement with Newell both in her individual capacity and as trustee of a trust which was involved in that agreement. We do not, however, think that this destroys petitioner's position herein. Reregistering the stock in Touchett's name after his purchase from petitioner might have been the cleaner and more punctilious thing to do. We are satisfied from this record, however, that Touchett, holding executed stock powers from *487 petitioner, as well as shares endorsed in blank by petitioner, had fully and completely purchased the Paintr stock and was the owner thereof prior to his sale of such stock to Newell. With respect to the August 27, 1973 agreement, although on its face it would appear somewhat inconsistent for petitioner to have executed the agreement in her personal capacity after having sold the shares to Touchett, we can well see how prudent counsel for Newell, conducting the negotiations, would have insisted on petitioner signing the agreement since the shares which were subject to the sale were still officially registered in her name.
As we examine the other significant facts in this record, we are clearly lead to the conclusion that petitioner's installment sale of her Paintr shares to her son, John Touchett, on August 1, 1973, had significant business as well as personal motivations. After the ouster of himself and other family members from Paintr in 1971, Touchett embarked upon a complex and difficult program in order to reacquire control of Paintr. A direct attempt at merger of Paintr into Newell having failed, Touchett and Newell collaborated in a program to acquire control of Paintr *488 through acquisition of a majority of the outstanding Paintr shares. Ultimately, and after bitter fighting between the opposing groups of Paintr shareholders, such control was acquired. As part of the process, Newell had entered into an option agreement with petitioner (and with other friendly shareholders) under which Newell could acquire petitioner's stock at a price of $ 15 per share. The option, however, was not an absolute requirement to buy; it was limited in time, and had certain other conditions, including a warranty by petitioner that the option stock would be free of liens and encumbrances, a representation which was not true, since a majority of her shares were pledged as collateral with two banks, either for her own loans or for the obligations of Touchett. As events evolved in 1973, it became more and more important to petitioner that Newell exercise its option with respect to her shares, or purchase them at the option price of $ 15 per share. Petitioner had loaned the majority of her Paintr shares to Touchett so that they could be pledged as collateral for Touchett's various loans and guarantees at the bank. Such stock apparently represented the principal collateral *489 which the bank held with respect to these loans and guarantees. By the summer of 1973, as the Paintr-Newell litigation in the Federal Courts dragged on, the market value of the Paintr stock began to decline significantly. The bank accordingly became dissatisfied with its secured position, both because of this fact as well as the fact that the bank examiners had apparently criticized it with respect to the quality of the Touchett loans.
The bank accordingly was applying increasing pressure on Touchett to liquidate his loans. The bank had (and warned Touchett that it had) the right to foreclose on the collateral and sell it on the open market at any time when the bank felt itself to be "insecure" with respect to the loans. Touchett was accordingly more than anxious that petitioner's option agreement with Newell be carried out in accordance with its terms. Unless the shares could be sold at the full $ 15 price, and the proceeds applied to his loans, the collateral would not cover the balance of the indebtedness, and he would be liable for the difference. If the bank foreclosed on petitioner's shares, there was a danger that the stock, being sold on the open market by the bank, *490 might fall into unfriendly hands at a time when the Newell takeover of Paintr was still not certain. Touchett also feared that such a happening might jeopardize his existing employment with Newell, and would also alert Newell to the fact that most of petitioner's shares were pledged as collateral and were not freely available to petitioner, thus giving Newell the opportunity to avoid its option agreement if it wished to do so. Petitioner's stock, to the extent of 33,509 shares, out of her total of 48,772 shares, was pledged with the M&S Bank, which was pressing Touchett hard for the repayment of his loans.At the time petitioner sold her stock to Touchett for $ 15 per share, the market price of the stock was only 6-1/4 to 7-1/4. A sale by the bank of petitioner's stock would have represented a substantial economic loss to petitioner. On the other hand, her sale to Touchett on August 1, 1973, locked in the price of $ 15 a share for petitioner, which was clearly to her advantage. If the proposed settlement of the suit between Paintr and Newell, involving a merger exchange of.78 shares of Newell for one share of Paintr, had been carried out on the date of petitioner's sale to *491 Touchett, petitioner would have received only 38,042.16 shares of Newell. At the then price of Newell shares, on the open market, (which was 11-5/8), such converted shares would have fetched only $ 442,240.11 on the open market, as compared to the $ 731,580 price at which petitioner sold to Touchett. If, instead of selling on the installment basis to Touchett, petitioner had sold her shares directly to Newell, the record shows that most of the proceeds would have gone to discharge Touchett's liabilities, leaving petitioner with a large gain to pay tax on in 1973, with such tax absorbing most of the remaining proceeds. Since the bank was demanding immediate payment of Touchett's loans, in amounts exceeding the $ 502,635 which petitioner would have realized from her 33,509 shares pledged with the M & S Bank, there was no possibility of negotiating a sale from petitioner to Newell which would qualify for installment basis reporting, since well over 30% of the sales proceeds of her entire block of 48,772 shares would have to be received and used at once to secure release of petitioner's collateralized shares with the M & S Bank (see section 453(b)(2)(A)(ii), quoted supra). *492 From petitioner's standpoint, therefore (not to mention Touchett's), the only solution to her problem was to effect a sale whereby she could realize the full $ 15 per share value of her shares, get her collateralized shares released from the M & S Bank, avoid jeopardizing the entire Newell-Paintr program of acquisition and merger, and still avoid being faced with a situation where she would have to recognize the full amount of her gain in 1973, while having only a minor portion of the proceeds available for the payment of the tax on her capital gain.
It is clear to us, therefore, that there were substantial benefits to petitioner in selling her shares to Touchett on the installment basis in 1973. It is further clear from this record that Touchett, as buyer, was not under petitioner's control (if anything, it might well have been the other way), and, under the provisions of the installment sale agreement, petitioner retained no security interest nor any other form of control over the disposition of the proceeds realized by Touchett upon his later sale to Newell. The only tax advantage petitioner received from this transaction was the ability to report her sale on the installment *493 basis, and match her payments of tax with sales proceeds as received. Her gain was not shifted to someone else through a paper transaction but remained with her. No one else realized any taxable gain from petitioner's sale to Touchett, since the sale was made at the full $ 15 price at which Touchett later resold to Newell. Petitioner's sale to Touchett was a legitimate step, contemplated by Congress in enacting the installment sales provisions. [4]
In summary, we find that the nontax reasons for petitioner's sale to Touchett far outweighed any tax reasons. The transaction was important and even necessary to enable petitioner to realize the best price for her stock, fortify her family's position in the Newell takeover of Paintr, and at the same time save her son and herself from financial disaster. We accordingly conclude that *494 petitioner's installment sale of her stock to Touchett in 1973 had economic reality and should be recognized for Federal income tax purposes. Since petitioner received none of the sales proceeds from her contract with Touchett in 1973, no amount was reportable by her in that year on account of the transaction. To give effect to the above, as well as concessions by the parties on other issues presented in this case, Decision will be entered under Rule 155.
Footnotes
*. This case was tried before Judge Sheldon V. Ekman, who died before deciding the case. By order of the Chief Judge dated March 19, 1982, this case was reassigned to Judge Jules G. Korner III↩ for disposition.
1. This agreement also covered certain Paintr shares in a "Lorraine Touchett Trust", and petitioner, individually and as trustee, joined in executing the agreement.↩
2. If anything, it appears from this record that Touchett exercised considerable influence over petitioner.↩
3. All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise stated, as in effect in the year in issue.↩
4. See the legislative history of section 44(d) of the Revenue Act of 1928, H. Rept. No. 2, 70th Cong., 1st Sess. (1927), 1939-1 C.B. (Part 2) 384, 394; S. Rept. No. 960, 70th Cong., 1st Sess. (1928), 1939-1 C.B. (Part 2) 409, 425. See also Commissioner v. South Texas Lumber Co.,333 U.S. 496, 503↩ (1948).